NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 16, 2023

S23P0046. MOODY v. THE STATE.

PETERSON, Presiding Justice.

In 2007, Jeremy Moody was charged with the April 5, 2007, rape and murder of 13-year-old Chrisondra Kimble and the murder of Kimble's 15-year-old cousin, Delarlonva Mattox, Jr.,[1] and other related offenses. Shortly after Moody's jury trial began in April 2013, Moody pleaded guilty to two counts each of malice murder, felony murder predicated on aggravated assault, aggravated assault, aggravated assault with intent to rob, and kidnapping with bodily injury, as well as to one count of rape. At the conclusion of the sentencing phase, a jury found the existence of multiple statutory

---

[1] Mattox's first name appears in the record as both "Delarlonva" and "Delarlalonva." Because his father testified at the sentencing trial that the correct spelling is "Delarlonva," we use that spelling in this opinion.

aggravating circumstances as to each murder and recommended a

sentence of death for each murder, and the trial court sentenced

Moody accordingly. See OCGA §§ 17-10-30 (b); 17-10-31 (a).[2]

On appeal, Moody raises thirteen claims of error, which we

reject, concluding as follows. The trial court did not abuse its

---

[2] The crimes occurred on April 5, 2007. Moody was indicted by a Fulton County grand jury on April 20, 2007, and the State filed written notice of its intent to seek the death penalty on May 1, 2007. Jury selection took place from March 7 through April 8, 2013, and Moody's trial began on April 10, 2013. After the State's opening statement, however, Moody pleaded guilty to all charges of the indictment. Moody's sentencing trial began on April 15, 2013. On April 24, 2013, the jury recommended death sentences for each of the murders. In an order filed on the same day, the trial court sentenced Moody to death for each of the malice murder counts in accordance with the jury's verdicts and to consecutive terms of imprisonment of twenty years for each of the two counts of aggravated assault with intent to rob, life for each of the two counts of kidnapping with bodily injury, and life for the count of rape. For purposes of sentencing, the trial court merged the two aggravated assault counts with the malice murder counts. See *Johnson v. State,* 300 Ga. 665, 667 (2) (797 SE2d 903) (2017) (holding that aggravated assault merged into malice murder where "there [wa]s no evidence of an interval separating the infliction of the victim's non-fatal wounds from the infliction of the wounds that killed her"). Although the trial court purported to merge the felony murder counts into the malice murder counts, those counts were actually vacated by operation of law. See *Malcolm v.* State, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993).

On May 17, 2013, Moody filed a motion for new trial, which he amended on February 18, 2015, on April 28, 2015, and on June 15, 2020. The trial court denied the amended motion in an order filed on August 3, 2020. After the trial court granted Moody's motion for an extension of time, see OCGA § 5-6-39, Moody filed a timely notice of appeal on October 2, 2020. The appeal was docketed to this Court's term beginning in December 2022 and was orally argued on December 6, 2022.

discretion in denying Moody's request to withdraw his guilty plea, because his plea was knowingly, intelligently, and voluntarily entered and therefore its withdrawal was not required to prevent a manifest injustice. By pleading guilty to all charges in the indictment against him, Moody waived his constitutional rights to represent himself at the trial he forewent and to decide the objective of his defense at such a trial. The trial court did not err in denying Moody's challenge to the composition of the master jury list, because he failed to show any violations of "essential and substantial" provisions of a jury selection statute that would warrant automatic reversal or would establish a prima facie case of a Sixth Amendment fair cross-section violation. The trial court did not abuse its discretion in denying Moody's motion for a mistrial based on juror misconduct, because the juror at issue did not share the information that he had learned from his misconduct with the remaining jurors and because the trial court promptly removed him. There was no plain error resulting from the admission of the challenged victim impact testimony because there is no reasonable probability that the

testimony contributed to the jury's decision to impose Moody's death sentences. The trial court did not err in charging the jury that its verdict as to sentencing must be unanimous. The record does not support Moody's prosecutorial misconduct claims or that the State pursued inconsistent theories in this trial and in that of his co-defendant.[3] The State's expert witness's testimony about his trainees' testing and evaluation of Moody did not violate the Confrontation Clause. And we reject Moody's other constitutional challenges — the execution of persons with mental illness not rising to the level of intellectual disability violates neither the federal nor the state constitutions, Georgia's death penalty statutes are not unconstitutional, and qualifying jurors according to their death penalty views is not unconstitutional.

Finally, as statutorily required in death penalty appeals, we

---

[3] The State also sought the death penalty against Moody's co-defendant, William Felts, in a separate trial held in 2016. See *Felts v. State,* 311 Ga. 547, 547 n.1 (858 SE2d 708) (2021). The jury found Felts guilty on all counts except the count of rape and following the sentencing phase, fixed the sentence for each of the murders at life imprisonment without the possibility of parole. See id. This Court affirmed Felts's convictions and sentences in May 2021. See id. at 547.

also review three additional matters regarding Moody's sentence. See OCGA § 17-10-35 (c). We determine that the sentence of death in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor. We determine that the evidence was sufficient to support the jury's finding beyond a reasonable doubt the existence of each of the statutory aggravating circumstances that it found. And we determine that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant. We therefore affirm Moody's convictions and sentences.

1. Because Moody pled guilty at the very beginning of the guilt/innocence phase of his trial, the only trial at which evidence was presented was his sentencing trial; the evidence presented at that sentencing trial showed the following. On April 5, 2007, Kimble and Mattox were spending their spring break from school at Mattox's father's home. Kimble's mother, who is the sister of Mattox's father, lived in the same home, and the cousins' grandmother was staying there temporarily to help care for her

5

grandchildren. Between 4:00 p.m. and 4:30 p.m., Kimble and Mattox told their grandmother that they were going to walk to the store to buy some snacks. When the teens had not returned by approximately 7:00 p.m., their grandmother and parents became concerned. After checking with the teens' friends with no success, the teens' parents contacted law enforcement and then, joined by other family members, searched for the missing teens late into the night. Early the next day, friends and neighbors joined family members in the search.

During the search, the families learned that Kimble and Mattox had been seen in the area of nearby Bethune Elementary School. Based on this information, on the afternoon of April 6, 2007, Kimble's mother and a young man from the neighborhood searched an area behind the school. While doing so, Kimble's mother noticed an open area in the fence and walked through it and into the wooded area behind it. There, she first saw some clothing, then the body of her nephew Mattox, and lastly the body of her daughter.

When they were found, they were both naked except for socks

on their feet and a leather belt tied around Mattox's ankles. Piles of clothing were located near Mattox's body, and law enforcement officials also discovered a store receipt from Dollar Tree at the crime scene. The medical examiner testified that both victims suffered numerous stab wounds that were consistent with the use of a flat-headed screwdriver. Blood spatter was located on a tree trunk near the ground, indicating that the victims were stabbed while lying on the ground.

According to the medical examiner, Kimble's primary cause of death was multiple stab wounds to her neck, with secondary causes being blunt trauma to the neck and stab wounds to the head. The medical examiner testified that Kimble received thirteen stab wounds to her neck and three stab wounds to her head, including what would have been a "very severe[ly]" painful wound to the ear. The medical examiner further testified that Kimble suffered blunt trauma to her neck and petechial hemorrhages in her eyes, injuries consistent with manual strangulation, and that she had vaginal injuries and abrasions on her face and thighs that were consistent

7

with her being face down in a wooded area and having her face and the front of her body repeatedly thrust against vegetation. The medical examiner opined that the stab wounds and the injuries to the vaginal area most likely occurred before Kimble's death and that Kimble could have survived for "minutes" or for "hours" after the stab wounds, although she would not have survived "very long following the strangulation." Subsequent forensic testing of the vaginal smears from Kimble revealed the presence of Moody's DNA.

The medical examiner testified that Mattox's cause of death was stab wounds to the head, neck, and chest and that he had approximately 41 stab wounds in total, including approximately 14 stab wounds to his neck alone. The medical examiner testified that the injuries to his neck would have been "quite painful" and would have resulted in "significant bleeding," as his left carotid artery and both of his jugular veins were pierced. She also opined that the multiple stab wounds to the top of Mattox's head would have required a significant amount of force to inflict, as they went through the skull and penetrated his brain, and that they would

8

have been "very painful." According to her testimony, some of the stabs to Mattox's chest entered his chest cavity and damaged the cephalic brachial vein, resulting in the collection of approximately half a liter of blood in his chest, and it would have taken "several minutes to an hour or so" for Mattox to bleed to death. She also testified that an abrasion on Mattox's back was consistent with his lying face-up in a wooded area with someone on top of him inflicting stab wounds.

The next day, on April 7, 2007, law enforcement officials received a telephone call from Moody's ex-girlfriend, Tameka Wright, who identified Moody as a suspect. Wright said that Moody might be attempting to leave town and that they should look for him at the bus station, and she provided a description of what Moody was wearing. Moody was arrested at the bus station with paperwork in his possession regarding trips to Orlando and Houston. On the way to the police station, Moody asked why he was being arrested. When his question was not answered, Moody suggested that he had watched the news and then stated, "You're not going to do this to

9

me. You're not going to put those kids on me."

Wright testified for the State regarding a statement that she had given to law enforcement officials on the day of Moody's arrest. According to Wright, Moody called her at 5:21 p.m. on the day of the murders and said that he was going to commit a robbery. Moody called her again about two hours later, saying that he had money. Later that night, he met her at her job and told her "that he didn't have the money, that it didn't go right, things didn't go as planned." Moody said that he had killed two drug dealers and that "they didn't really mean nothing . . . [t]o nobody." Moody said that the victims had believed that he had a gun, and that he had walked them "at gunpoint" into the woods near his mother's house, killed them, and left their bodies in the woods. Moody described the victims as "young" and "scared." He also said that he undressed the victims because he did not want any evidence, such as hairs or fibers, to be found on them. Moody told Wright that he wanted to return to the crime scene in order to move the bodies to prevent anyone from finding them, but Wright told Moody not to. Wright testified that

Moody acted like himself and that she did not believe him. She also testified that she previously had seen Moody both under the influence of drugs, as well as alcohol, and that he did not appear to be under the influence of either when she saw him on the night of the crimes.

Wright further testified that, on the night of April 6, 2007, Moody called her to inform her that, according to news reports, the victims' bodies had been discovered. After Wright watched the news for herself and heard the ages of the victims, she confronted Moody about his telling her that the victims were "drug dealers" when they were actually "two children." Moody responded that the victims meant nothing to him and that they appeared to him to be adults. Wright also testified that Moody told her that, because he had removed the victims' clothes, people were going to make it out to be worse than it was, and he specifically used the word "rape." Wright then asked him multiple times if he raped either one of the victims, and Moody denied doing so. According to Wright's testimony, Moody never expressed remorse for murdering the victims. Moody elicited

11

Wright's promise not to call the police, but she did anyway.

In addition to the above evidence, presented in part in support of statutory aggravating circumstances that the State had given notice of, the State presented extensive non-statutory aggravating evidence regarding Moody's violent behavior both prior to the murders and during his pretrial detention, including the following. The State introduced evidence of Moody's certified convictions for simple battery, for simple battery involving family violence, and for obstruction of an officer that resulted from an incident in which Moody attacked his girlfriend at the time and a person who came to her defense. The State also presented testimony that Moody harassed this same former girlfriend by threatening to kill her and her family beginning with her infant granddaughter and by repeatedly calling the daycare center where she worked looking for her and threatening to kill her co-workers, the children at the daycare center, and anyone else who got in his way. He also repeatedly violated the restraining order that the former girlfriend obtained against him. There was testimony that Moody beat

12

Wright's five-to-six-year-old daughter with a belt. And one of Moody's female acquaintances testified that Moody tried to strangle her when she thwarted his plans to have sex with her approximately two to three weeks before the murders, that he later threatened to kill her, and that he subsequently tried to break into the house where she was staying through a window near her bedroom.

The evidence concerning Moody's pretrial detention while awaiting trial showed the following. He had been violent with jail personnel many times, including attacking a guard with a shank; he had made numerous verbal and written threats to kill specific jail personnel, including a law librarian and a detention officer; he had been found in possession of contraband, including a shank, pills, and cellphones, both in his cell and on his person; he had been involved in numerous incidents in which the jail's special team for dealing with dangerous inmates had to intervene, and he had tried to intimidate new officers on this team by throwing water or feces on them and spitting at them; and he had abused the nurses at the jail in numerous ways, including making derogatory sexual comments

13

to them, throwing various liquids such as a mixture of urine and sour milk at them, spitting at and kicking one of them, and exposing himself to one of them.

Moody's guilty plea renders a review of the evidence for its constitutional sufficiency moot as to his guilt.[4] See *Thomason v. Caldwell,* 229 Ga. 637, 644 (194 SE2d 112) (1972). Nevertheless, we have reviewed the evidence from his sentencing trial and conclude that, when viewed in the light most favorable to the sentencing verdicts, the evidence presented was sufficient to enable a rational trier of fact to find beyond a reasonable doubt each of the statutory aggravating circumstances found by the jury, which are discussed further in Division 16 below. See *Ring v. Arizona,* 536 U.S. 584 (122 SCt 2428, 153 LE2d 556) (2002) (holding that statutory aggravating circumstances must be proven to a jury beyond a reasonable doubt);

---

[4] To the extent that OCGA § 17-10-35 (f) could be understood to require us nevertheless to review the factual substantiation of guilt as a statutory matter (a point on which we offer no opinion), this record is plainly sufficient. In addition to all of the facts supporting guilt recited above, as detailed below in Division (2) (a), Moody admitted as part of his guilty plea colloquy that he was pleading guilty to the crimes with which he was charged because he had, in fact, committed those crimes.

*Jackson v. Virginia,* 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (providing the constitutional standard for the review of the sufficiency of the evidence); OCGA § 17-10-35 (c) (2) (requiring a review of the sufficiency of the evidence supporting statutory aggravating circumstances); UAP IV (B) (2) (providing that, in all death penalty cases, this Court will determine whether the verdicts are supported by the evidence).

*Guilty Plea*

2. Because Moody's guilty plea — if valid — would waive several of his claims, we first address his challenges to that plea. In conducting that review, we note that the "[e]ntry of a plea is not some empty ceremony, and statements made to a [trial] judge in open court are not trifles that defendants may elect to disregard." *United States v. Stewart,* 198 F3d 984, 987 (7th Cir. 1999). We conclude that Moody's guilty plea was constitutionally valid and that he did not establish a "manifest injustice" requiring its withdrawal.

At trial, during a brief recess between the State's opening

15

statement and the defense's, defense counsel announced that Moody had decided to plead guilty to all 11 counts of the indictment. After an extended colloquy, the trial court found Moody's plea of guilty to be entered knowingly, freely, and voluntarily, and the court accepted the plea. The sentencing phase of Moody's trial began on April 15, 2013. During jury deliberations nine days later, Moody made a motion to withdraw his guilty plea.

Ordinarily, a defendant has the absolute right to withdraw a guilty plea until his sentence is pronounced. See OCGA § 17-7-93 (b). But in cases where the State seeks the death penalty, a defendant has no such right; instead, he can seek to withdraw it only "to prevent a manifest injustice." *Browner v. State,* 257 Ga. 321, 321-322 (1), 323 (3) (357 SE2d 559) (1987). What constitutes a manifest injustice

> by necessity var[ies] from case to case, but it has been said that withdrawal is necessary to correct a manifest injustice if, for instance, a defendant is denied effective assistance of counsel, or the guilty plea was entered involuntarily or without an understanding of the nature of the charges.

*State v. Evans*, 265 Ga. 332, 336 (3) (454 SE2d 468) (1995).

Moody argues that his plea was involuntary and thus that withdrawal was necessary to correct a manifest injustice. He contends that he was coerced into pleading guilty by the trial court's ruling two days before his plea denying his request to represent himself and by its ruling on the morning of the plea that defense counsel rather than Moody could decide what strategy to pursue at trial. The State has the burden on direct appeal of establishing that the plea was entered knowingly and voluntarily. See *King v. State*, 270 Ga. 367, 369 (1) (509 SE2d 32) (1998). The State may meet this burden "by showing on the record of the guilty plea hearing that the defendant was cognizant of all the rights he was waiving and the possible consequences of his plea, or by use of extrinsic evidence that affirmatively shows that the guilty plea was knowing and voluntary." *Loyd v. State*, 288 Ga. 481, 485 (2) (b) (705 SE2d 616) (2011) (citation and punctuation omitted). A trial court's decision on a motion to withdraw a guilty plea will not be disturbed absent an abuse of discretion. See *McGuyton v. State*, 298 Ga. 351, 353 (1) (a)

17

(782 SE2d 21) (2016). Here, the record supports the trial court's finding that Moody's plea was not coerced but instead was knowingly, intelligently, and voluntarily entered.

(a) *Guilty Plea Hearing.* Moody testified under oath at the plea hearing that he was 35 years old, had completed his G.E.D., and was not then under the influence of alcohol, drugs, or medication.[5] The prosecutor listed the charges brought against Moody, and Moody indicated that he understood those charges. Moody also confirmed that he understood that by pleading not guilty or remaining silent and not entering a plea, he would obtain a jury trial, and that by entering a plea of guilty, he was waiving the right to a jury trial. Moody also acknowledged his initials and signature on the guilty-plea form, a five-page document that explained the rights that he was waiving by pleading guilty, and which Moody confirmed that he

---

[5] Moody did inform the trial court that he was taking antidepressants, mood stabilizers, antibiotics, pain medication, and post-traumatic stress medication. When asked whether those medications "in any way affect[ed his] ability to understand this proceeding," Moody responded, "No; not that I know of." On the guilty plea form, Moody affirmed that he was not under the influence of any medication that would affect his ability to understand what he was doing at the time.

18

had discussed with both of his attorneys. This form set out the charges that Moody faced and the maximum sentence that could be imposed for each charge, including a sentence of death for each of the murders.

Both on the guilty-plea form and during the hearing, Moody affirmed that he had had sufficient time to speak with his attorneys regarding the charges in the indictment, including any potential defenses, and that he did not need any more time to speak with counsel regarding the guilty plea and the guilt/innocence phase of his case.

When the prosecutor asked Moody whether he was satisfied with the services of counsel, Moody stated that he "wasn't," referring to conflicts with counsel that led to his request to proceed pro se. The trial court pointed out that it had previously "ruled about the representation issue" and stated that "that question . . . is not part of the plea colloquy under . . . superior court rules." See Uniform Superior Court Rule 33.8. Moreover, Moody affirmed on the guilty-plea form that he was satisfied with his counsel's services. Moody

19

testified that he understood that he was pleading guilty to all of the charges in the indictment. He was again informed of the maximum possible sentence for each charge, and he again confirmed his understanding of those possible sentences, along with the fact that a jury would determine his sentence following a separate sentencing trial, choosing between a sentence of death, a sentence of life without the possibility of parole, and a sentence of life with the possibility of parole.

Moody was advised about the trial rights that he would be waiving by pleading guilty, and he answered affirmatively that he understood. Both on the guilty plea form and during the hearing, Moody confirmed that no one had in any way "threatened," "forced," or "coerced" him to plead guilty and that no one had "promised [him] anything to get [him] to enter this guilty plea." He also affirmed that it was his decision to waive his rights and enter a guilty plea to all charges in the indictment because he was, in fact, guilty of all of those charges. After pleading guilty, Moody affirmed that his guilty plea was freely and voluntarily given with full knowledge of the

charges against him and that he understood that he might have only a limited right to appeal his guilty-plea convictions.

After the prosecutor set out the factual basis for the guilty plea, the trial court conducted its own inquiry. Moody affirmed that, "just before [lead defense counsel] was about to get up to deliver the opening statement in th[e guilt/innocence] part of [his] case," he had indicated that he wanted to speak with counsel and had subsequently spoken "for some time" with his attorneys regarding his decision to plead guilty rather than to proceed with the guilt/innocence phase of trial. Then the trial court conducted the following colloquy with Moody regarding his reasons for pleading guilty:

> THE COURT:  Okay. Are you pleading guilty now rather than going through with a trial as to the guilt[/]innocence phase because that's what you want to do?
> THE DEFENDANT:  Yes, your honor. *I just feel it would be more appropriate for the families involved in this not to go through trial procedure, and it's just, you know, just a decision I made, sir.*
> THE COURT:  Okay.  So as far as the reason why you're doing it, *you believe it's in your best interest to go that way as opposed to putting the State and the families and other people through the trial of the facts as to the guilt and*

21

*innocence. Is that what you're saying?*
THE DEFENDANT: *Yes, your honor. Just to try to resolve this issue as quickly as possible, your honor.*
THE COURT: Okay. And the important part for me – because remember my job is to make sure that what you're doing is freely and voluntarily done. *And is that true? Are you doing that freely and voluntarily?*
THE DEFENDANT: *Yes, your honor.*

(Emphasis added.) Thus, Moody did not merely affirm that he believed that it was in his own best interest to plead guilty, but he also clearly articulated a reasonable basis for his decision to plead guilty totally unrelated to the trial court's recent rulings against him, namely, his desire to "resolve this issue [of his guilt] as quickly as possible" to avoid the necessity of a trial for "the families involved," apparently referring to both his family and the families of the victims. See *Loyd*, 288 Ga. at 485 (2) (b) (affirming the trial court's denial of a death-sentenced defendant's request to withdraw his guilty plea and noting that defense counsel had stated to the trial court that the defendant "had expressed to him 'logical and thought-out reasons' for his decision" to enter a non-negotiated plea, including that the defendant "wanted 'to admit to what he did' and

22

move on to 'the issues of what the punishments are'" (punctuation omitted)); *McKiernan v. State*, 288 Ga. 140, 143 (2) (702 SE2d 170) (2010) (noting that one of the motivating factors for the defendant's decision to enter a guilty plea was to avoid putting his family through a trial in concluding that he voluntarily and knowingly entered his guilty plea).

Then the trial court questioned Moody about his medications and asked him, "Do you feel like you understand what you are doing here today, what your choice is, and why you're doing it?" Moody responded that he did. Moody also testified that he understood that there would still be a sentencing phase of trial. The trial court then returned to the issue of the voluntariness of Moody's decision, and the following colloquy ensued, in which Moody once again affirmed that he was pleading guilty because he believed that it was in his best interest to do so:

> THE COURT: Okay. And, again, are you [pleading guilty and foregoing a jury trial as to guilt/innocence] because you want to do it?
> THE DEFENDANT: Yes, your honor.
> THE COURT: *As I understood what you said before,*

*you're doing it because you believe that's the best thing for you?*
THE DEFENDANT:  *Yes, your honor.*

(Emphasis added.)

Later, returning one final time to the issue of the voluntariness of Moody's decision to plead guilty, the trial court engaged in the following colloquy with Moody:

> THE COURT:  . . .  We have had a discussion otherwise in this case recently about your rights as they pertain to going forward with this case.  The important question I have for you is, *despite the fact that I have made a ruling about your representation*, are you still pleading guilty understanding where we go from here because that's what you want to do and not because of that ruling that I made?  *In other words, am I forcing – do you feel like I'm forcing you into pleading guilty because of the ruling I made or are you pleading guilty because you think it's the best thing for you to do?*
> THE DEFENDANT:  *I feel it is the best thing to do at this time.*

(Emphasis added.)

The trial court then heard from Moody's lead counsel that he believed that Moody was entering his guilty plea because he believed that it was "the best thing for him to do," that Moody understood his decision to plead guilty, and that his decision was knowing and

24

voluntary, and both of Moody's attorneys told the trial court that they had no reservations about having the court accept the plea. The trial court then ruled that "Moody's plea of guilty [wa]s freely, voluntarily, and knowingly made" and "accept[ed] his plea as tendered" based on "the colloquy that ha[d] occurred before [the trial court] as well as the information contained in [the plea agreement form initialed and signed by Moody]," which the trial court entered into evidence.

(b) *Moody's Request to Withdraw His Plea.* While the jury was deliberating at the conclusion of the sentencing trial, the defense moved to withdraw Moody's guilty plea. When the trial court asked for the basis for the motion, Moody's lead counsel responded:

> Your honor, . . . he hasn't said to me exactly what his basis is, but I would contend that his basis is just general disagreement with the strategy of the defense and the way the case was worked up. . . .

After an off-the-record discussion with Moody, lead counsel "incorporate[d] every concern that [Moody] ha[d] expressed to the court, whether in ex parte session or in open court concerning the

25

manner in which his defense ha[d] been conducted." Counsel stated that "all of [those concerns] f[e]ll under the general rubric of he wanted to represent himself," and counsel listed the preparation and presentation of the case, issues with Moody's access to the law library, and issues regarding Moody's medication. Counsel also stated that Moody "believe[d that] he was pressured into a *Faretta*[6] hearing" that he felt that he was unprepared for.

The trial court made detailed findings regarding Moody's medications and his issues with the law library that are amply supported in the record, and Moody has not raised those issues on appeal. With regard to Moody's claim that he had been "pressured" into a *Faretta* hearing, the trial court noted that it had "regularly spoke[n] with Mr. Moody in the presence of opposing counsel" and also in ex parte proceedings in order for the trial court to be able to have "full free-ranging discussions" with him regarding his "feelings about his attorneys." The trial court found that, "consistent with the findings that [the court had] made at the *Faretta* hearing," Moody's

---

[6] *Faretta v. California,* 422 U.S. 806 (95 SCt, 2525, 45 LE2d 562) (1975).

26

"feelings" had "vacillated dramatically" over the course of those hearings and had often focused on issues regarding the jail. The trial court pointed out that "the *Faretta* hearing was lengthy," that "it [occurred] after a number of conversations about that issue," and that "it was clear to the court that the decision that [the court] made was what was commanded by the evidence." Moreover, the trial court pointed out that, "intervening between the *Faretta* hearing and Mr. Moody's decision to plead guilty was the start of this case at trial for the guilt[/]innocence phase, which notably included the State's opening statement" that "appropriate[ly] chronicl[ed] the evidence that would have come out in this case in the guilt[/]innocence phase had that gone forward." The trial court found that "[i]t was in the face of that very promise of that evidence coming out that Mr. Moody made his decision to plead guilty," and the trial court noted that it was not unusual "in the court's experience as a lawyer or a judge that[,] when faced with the reality of what the evidence against him was going to be[,] a defendant pled guilty."

Regarding the voluntariness of Moody's guilty plea, the trial

27

court found the following:

> To say that [Moody] was pressured into [pleading guilty] . . . would . . . fly in the face of the very questions he was asked during the plea colloquy. I asked him are you doing this because you're angry at me or disappointed in the way I ruled? No was the answer. I can draw no conclusion from that except that those two things are not related to each other because he told me they aren't related to each other. . . .

The trial court further found that the "*Faretta* hearing ha[d] nothing to do with the plea," that Moody made a "clear, unequivocal, voluntary decision in the face of what he knew would be the evidence against him to plead guilty and accept responsibility," and that Moody "was questioned as thoroughly and carefully as any defendant [the trial court had] ever seen who entered a plea of guilty, by the State, by the court, via a colloquy [t]here in court, as well as a written plea sheet." Then, finding that his plea was "freely and voluntarily entered" and that "there [wa]s no reason whatsoever to set it aside," the trial court denied Moody's request to withdraw his guilty plea.

Moody now argues that his response to the trial court that he

28

felt that pleading guilty was "the best thing to do at this time" indicates that he believed that pleading guilty was "the best thing" for him to do given that, at that time, "the [trial] court [had] told [him] that if he went to trial, his lawyers would admit his guilt[.]" But that is not what Moody said at the plea colloquy. At no time did Moody state that his decision to plead guilty was the result of feeling coerced to do so by the trial court's rulings denying his request to represent himself and permitting trial counsel to pursue a strategy that he expressed opposition to, even when the trial court explicitly asked him whether he felt that its "ruling about [his] representation]" had "forc[ed him] into pleading guilty." Accordingly, the record supports the trial court's factual findings that the trial court's adverse rulings and Moody's decision to plead guilty were unrelated to each other. The record also supports the trial court's conclusion that Moody knowingly and voluntarily entered his guilty plea. See *Jackson v. State*, 285 Ga. 840, 840-841 (1) (684 SE2d 594) (2009) (affirming the denial of the appellant's motion to withdraw his guilty plea where he had told the trial court

29

at the plea hearing that he was not under the influence of alcohol, drugs, or any intoxicants but later claimed that his plea was involuntary because he had been under the influence of drugs).

Nonetheless, Moody contends that, in applying the test for manifest injustice, this Court in other cases has invalidated pleas as involuntary based on an antecedent constitutional violation, and he urges us to do the same here. But the cases that Moody cites in support do not apply.

Several of the cases that he cites involved judicial participation in a defendant's plea negotiations "so great as to render a guilty plea involuntary." *Pride v. Kemp*, 289 Ga. 353, 354 (711 SE2d 653) (2011) (citations and punctuation omitted); see also *Winfrey v. State*, 304 Ga. 94, 97-102 (II) (816 SE2d 613) (2018); *McDaniel v. State*, 271 Ga. 552, 553-554 (2) (522 SE2d 648) (1999). But here, Moody relies on an unfavorable ruling on a separate issue, not improper judicial participation in the plea negotiations, so these cases do not apply.

Moody also cites in support *Alexander v. State*, 297 Ga. 59 (772 SE2d 655) (2015), and *Wharton v. Jones*, 248 Ga. 265 (282 SE2d 310)

30

(1981). But those cases are irrelevant here, because the defendant in each of them contended that he received the ineffective assistance of counsel *with respect to the guilty plea*, and Moody makes no such claim. See *Alexander*, 297 Ga. at 61-64 (distinguishing between a Sixth Amendment ineffective assistance of counsel claim in relation to a guilty plea and a Fifth Amendment due process claim that a plea was not knowingly and voluntarily made).

Finally, Moody relies on *Browner*, in which this Court concluded that the trial court erred in not allowing the defendant, who had entered a non-negotiated plea to a murder count for which the State was seeking the death penalty, to withdraw his guilty plea to prevent a manifest injustice. See 257 Ga. at 323 (3). There, the defendant "was not present at two conferences discussing the complexities of his guilty plea – in particular, whether the judge or a jury would impose sentence, a matter of substantial importance to him." Id. As discussed above, what constitutes "manifest injustice" is case-dependent, and the problematic circumstances in *Browner* involved the plea itself and are not present here.

In sum, the transcript of the guilty plea hearing and the guilty plea form signed by Moody amply support the trial court's findings that the plea was not coerced by the trial court's rulings denying Moody's request to represent himself and allowing trial counsel to determine the objective of the defense, and it supports the trial court's ruling that Moody's guilty plea was knowing and voluntary. We also conclude that the withdrawal of the guilty plea was not necessary to correct a manifest injustice.

### *Pretrial Issues*

3. Moody argues that the trial court erred in denying his request for self-representation at the guilt/innocence phase following a *Faretta* hearing.[7] As we just held, Moody's guilty plea

---

[7] The record shows that approximately five months before jury selection in his case was scheduled to begin, Moody began to express to the trial court that he was dissatisfied with his counsel and that he wanted to represent himself. The trial court held several ex parte hearings on the matter, and during those hearings, Moody vacillated as to whether his frustrations were with his attorneys or with the conditions of his incarceration and as to whether he truly desired to represent himself at trial. Later, trial counsel requested a *Faretta* hearing because Moody had announced that he wanted to represent himself. At the conclusion of that hearing, the trial court denied Moody's request, concluding that Moody's desire to represent himself was "not based on a belief about the outcome of this case" and that his "self-destructive behavior

was valid. Consequently, Moody waived any argument regarding his right to self-representation at the guilt/innocence phase.

Under both this Court's precedent and that of the United States Supreme Court, a valid guilty plea generally operates as a waiver of independent claims of constitutional error that occurred before the plea. See *Tollett v. Henderson*, 411 U.S. 258, 267 (93 SCt 1602, 36 LE2d 235) (1973) (holding that a defendant who pleads guilty waives all "independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea"); *Addison v. State*, 239 Ga. 622, 624 (238 SE2d 411) (1977) (stating that this Court has recognized and repeatedly applied the principle in *Tollett* and listing this Court's decisions holding that a guilty plea waives a speedy indictment claim, a claim of invalid jury selection and grand jury composition, and an illegal search claim).

As the Supreme Court explained in *Tollett*:

[A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a

---

as well as some desire of benefit, i.e., better treatment at the jail, . . . was preventing him from making a knowing and intelligent waiver of . . . the right to discharge his attorneys."

criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.

411 U.S. at 267. "An exception will only be made if the error goes to the very power of the State to bring the defendant into court." *Moore v. State*, 285 Ga. 855, 858 (2) (684 SE2d 605) (2009) (citation and punctuation omitted). Cf. *Kennedy v. Carlton*, 294 Ga. 576, 577 (1) (757 SE2d 46) (2014) ("A plea of guilty does not waive the defense that an indictment charges no crime."). Thus, a guilty plea generally waives non-jurisdictional defects in pretrial proceedings. See *Harris v. Hopper*, 236 Ga. 389, 391 (224 SE2d 1) (1976), overruled on other grounds by *Griffin v. State*, 282 Ga. 215, 221-222 (5) (647 SE2d 36) (2007).

Whether this principle means that a defendant allegedly denied his right to self-representation at the guilt/innocence phase has, by virtue of his guilty plea, waived a *Faretta* challenge on appeal is a question of first impression in this Court, and the United States Supreme Court has not spoken directly on the issue. The

federal appellate courts to decide this question of federal constitutional law are split, although only the Ninth Circuit has held that a defendant who pleads guilty may still maintain his *Faretta* challenge on appeal. See *United States v. Hernandez*, 203 F3d 614 (9th Cir. 2000), overruled on other grounds by *Indiana v. Edwards*, 554 U.S. 164 (128 SCt 2379, 171 LE2d 345) (2008), as recognized in *Jarrett v. Shinn*, 836 Fed. Appx. 538, 540 (9th Cir. 2020).[8] In *Hernandez*, the Ninth Circuit held that a guilty plea by a defendant wrongfully deprived of his right to self-representation was automatically involuntary, because a "court's refusal to allow [a defendant] to exercise the right of self-representation forced him to

---

[8] We note that, relying in part on *Hernandez*, the Court of Appeals of Michigan has come to the same conclusion in an unpublished opinion. See *People v. Hoffman*, No. 266560, 2007 Mich. App. LEXIS 260, at *7 (Mich. Ct. App. Feb. 6, 2007) (citing *Hernandez*, 203 F3d at 626-627), leave to appeal denied, 737 NW2d 767 (Mich. 2007). California's appellate courts have reached the same result, but based on state statute instead of federal constitutional law. See, e.g., *People v. Marlow*, 96 P3d 126, 146-147 (II) (B) (Cal. 2004) (concluding that "the claim of erroneous denial of a *Faretta* motion . . . is cognizable on appeal" based on a determination that a *Faretta* challenge is a challenge to the "'legality of the proceedings'" as set forth in Cal. Penal Code § 1237.5 (a), which provides under what circumstances a defendant is allowed to appeal from a judgment of conviction upon a plea of guilty (citing *People v. Robinson*, 65 Cal. Rptr. 2d 406 (1997))).

choose between pleading guilty and submitting to a trial *the very structure* of which would be unconstitutional." 203 F3d at 626 (emphasis in original). The Ninth Circuit reasoned that a choice between two such alternatives deprived the defendant "of the choice between the only two constitutional alternatives — a plea and a fair trial" — and that, therefore, a court's improper *Faretta* ruling "'imposed unreasonable constraints'" on the defendant's decision to plead guilty. Id. at 627. In sum, according to the Ninth Circuit, "[w]hen a defendant is offered a choice between pleading guilty and receiving a trial that will be conducted in a manner that violates his fundamental Sixth Amendment rights, his decision to plead guilty is not voluntary," because the defendant "has not been offered the lawful alternatives — the free choice — the Constitution requires." Id.

Although Moody does not cite *Hernandez*, he urges this Court to adopt essentially the same reasoning that the Ninth Circuit employed there. Specifically, Moody's arguments here would require us to hold that his guilty plea was rendered involuntary based on

the trial court's earlier denial of his right to represent himself, as he argues that, by wrongfully denying Moody's request to represent himself, "the trial court effectively forced [him] to forego any meaningful exercise of his constitutional rights at trial."[9]

But no other circuit has found the rationale in *Hernandez* persuasive, and at least four other federal courts of appeal have adopted the opposite view, holding that a guilty plea waives a *Faretta* challenge. See *United States v. Dewberry*, 936 F3d 803, 805-807 (II) (8th Cir. 2019); *United States v. Moussaoui*, 591 F3d 263, 279-280 (II) (A) (4th Cir. 2010); *Gomez v. Berge*, 434 F3d 940, 942-943 (II) (7th Cir. 2006); and *United States v. Montgomery*, 529 F2d

---

[9] We note that our discussion here concerns Moody's right to self-representation during the guilt/innocence phase of trial and not during the penalty phase. Moody's pretrial concerns about self-representation were clearly focused on issues of guilt and innocence. Likewise, his arguments on appeal about self-representation go to the voluntariness of his guilty plea. Moody's brief states regarding the scope of his denied request regarding self-representation: "Mr. Moody repeatedly made clear that he wanted to contest his guilt. If he could not decide that objective while represented by counsel, he was willing to forgo counsel altogether in furtherance of his desire to contest guilt." We discern no argument that Moody should have been allowed to represent himself at the penalty phase. Accordingly, our holding is limited to the waiver of claims regarding self-representation at the guilt/innocence phase.

1404, 1406-1407 (10th Cir. 1976); see also *United States v. Williams*, 29 F4th 1306, 1314-1315 (II) (11th Cir. 2022) (noting majority view "that an improper denial of the right to self-representation does not render a subsequent guilty plea involuntary, so the subsequent guilty plea waives the right to appeal the improper denial.").[10]

In explicitly rejecting the reasoning of the Ninth Circuit, both the Fourth and Eighth Circuits pointed out that *Hernandez*'s rationale "is based on the false premise that the defendant who is denied his right to represent himself is forced to *either* plead guilty or submit to an unconstitutional trial." *Dewberry*, 936 F3d at 806 (emphasis added); see also *Moussaoui*, 591 F3d at 280 ("The *Hernandez* court's conclusion that the defendant's guilty plea was involuntary was based on a faulty premise, namely, that his only alternative was to submit to an unconstitutional trial."). As both the

---

[10] We note that some state intermediate appellate courts have reached the same conclusion as the Fourth, Seventh, Eighth, and Tenth Circuits. See, e.g., *State v. Szemple*, 753 A2d 732, 736 (N.J. Super. Ct. App. Div. 2000); *People v. Shields*, 613 N.Y.S.2d 281, 282 (N.Y. App. Div. 1994); *State v. Claiborne*, No. 61343-0-I, 2009 Wash. App. LEXIS 1002, at *6-7 (Wash. Ct. App. Apr. 27, 2009); *State v. Jens*, No. 03-3153-CR, 2005 Wisc. App. LEXIS 62, at *10-12 (Wis. Ct. App. Jan. 25, 2005).

Fourth and Eighth Circuits reasoned, this premise is flawed because it "fails to account for the fact that if the defendant proceeded to trial and was convicted, he could seek an appellate remedy for the constitutional violations he alleged." *Moussaoui*, 591 F3d at 280; see also *Dewberry*, 936 F3d at 806 (same).

Furthermore, as the Eighth Circuit observed, "the approach used in *Hernandez* is inconsistent with [long-standing] Supreme Court precedent" holding that a "guilty plea represents a break in the chain of events which has preceded it in the criminal process.'" *Dewberry*, 936 F3d at 807 (quoting *Tollett*, 411 U.S. at 267).[11] As the

---

[11] In *Hernandez*, the Ninth Circuit cited *Tollett* and also the trilogy of cases that the Supreme Court identified there, i.e., *Brady v. United States*, 397 U.S. 742 (90 SCt 1463, 25 LE2d 747) (1970), *McMann v. Richardson*, 397 U.S. 759 (90 SCt 1441, 25 LE2d 763) (1970), and *Parker v. North Carolina*, 397 U.S. 790 (90 SCt 1458, 25 LE2d 785) (1970), as recognizing the principle "reaffirm[ed]" by the Court in *Tollett* that "[w]hen a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett*, 411 U.S. at 267. But the Ninth Circuit cited *Tollett*, *Brady*, *McMann*, and *Parker* only for the law regarding the validity of guilty pleas. See *Hernandez*, 203 F3d at 618 (citing *Tollett*, 411 U.S. at 267, *Brady*, 397 U.S. at 748, and *McMann*, 397 U.S. at 766); id. at 618 n.5 (citing *Brady*, 397 U.S. at 749-758, and *Parker*, 397 U.S. at 794-798); id. at 619 (citing *Brady* at 754-755); id. at 619 n.7 (citing *McMann*, 397 U.S. at 771 and *Brady*, 397 U.S. at 756, 760); and id. at 626 (citing *Brady*, 397 U.S at 754-755, 748 (I) n.6)).

Eighth Circuit further noted, Supreme Court precedent also holds that "'case-related constitutional defects' are made 'irrelevant to the constitutional validity of the conviction' by a later guilty plea 'because the defendant has admitted the charges against him.'" Id. (quoting *Class v. United States*, ___ U.S. ___ (138 SCt 798, 804-805, 200 LE2d 37) (2018)).

Moreover, in applying *Tollett*, we have concluded that, with limited exceptions, "once a defendant has solemnly admitted in open court that he is in fact guilty of the offense charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Addison*, 239 Ga. at 624 (citing *Tollett*, 411 U.S. at 267); see also *Moore*, 285 Ga. at 858 (2) (holding that the defendant's claim that "the affidavits in support of his arrest warrant were insufficient to establish probable cause" was waived in light of his knowing and

Significantly, the Ninth Circuit failed to acknowledge any United States Supreme Court precedent holding that a subsequent voluntary guilty plea generally operates as a waiver of claims of constitutional error that occurred prior to the plea.

voluntary plea). We have applied this principle when the specific constitutional right being waived as a result of the guilty plea involved the right to counsel. See *Powell v. State*, 309 Ga. 523, 528 (3) (847 SE2d 338) (2020) (stating that, even if the defendant had properly requested new counsel, we need not consider his claim that the trial court erred by denying his request, because, "[a]s a general rule, a guilty plea waives all defenses except that based on the knowing and voluntary nature of the plea").

The limited exceptions to the general rule of waiver are for claims that go "to the very power of the State to bring the defendant into court to answer the charge brought against him." *Blackledge v. Perry*, 417 U.S. 21, 30 (94 SCt 2098, 40 LE2d 628) (1974); see also *Moore*, 285 Ga. at 858 (2) ("An exception will only be made if the error goes to the very power of the State to bring the defendant into court." (citation and punctuation omitted)). A *Faretta* challenge does not present that situation.

Accordingly, we agree with the Eighth Circuit that *Hernandez*'s rationale, which is essentially the rationale that Moody

urges us to adopt, "turns . . . on its head" the rule that "'case-related constitutional defects' are made 'irrelevant to the constitutional validity of the conviction' by a later guilty plea . . . by making a defendant's admission of guilt irrelevant because of an earlier purported case-related constitutional defect." *Dewberry*, 936 F3d at 807 (quoting *Class*, 138 SCt at 804-805); see also *Montgomery*, 529 F2d at 1407 (holding that a "voluntary plea of guilty is the independent intervening act which renders ineffectual the prior failure to allow [an] appellant to represent himself at a trial" and opining that "[t]o hold otherwise would open the door to manipulations and game[s]manship").

Moody's argument that the *Faretta* issue raises a *structural* error does not alter our conclusion. See *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (104 SCt 944, 79 LE2d 122) (1984) (the improper denial of the right to self-representation is a structural error and requires automatic reversal); *Oliver v. State*, 305 Ga. 678, 680 (2) (827 SE2d 639) (2019) (same). Although "[t]he consequence of a 'structural' error is that it is not subject to harmless error review, . . .

such errors can still be waived." *Jackson v. Bartow*, 930 F3d 930, 934 (7th Cir. 2019) (citation omitted)) (holding that a defendant can waive his claim of a prior structural error, specifically a *Faretta* claim, by validly pleading guilty).

Indeed, *Tollett* itself supports this conclusion, as the Supreme Court there determined that the defendant's plea in that case waived any claim that African-Americans had been systematically excluded from the grand jury that indicted him, see 411 U.S. at 261-266, an error that the Supreme Court confirmed to be structural in *Vasquez v. Hillery*, 474 U.S. 254, 266 (106 SCt 617, 88 LE2d 598) (1986) (reaffirming "the Court's long commitment to a rule of reversal" in the case of racial discrimination in the selection of the grand jury); see also *Williams*, 29 F4th at 1314 (reviewing *Class*, 138 SCt at 804-805, and concluding that it "tells us that that a defendant may waive a claim of structural error by entering a defendant's voluntary guilty plea."); *Moussaoui*, 591 F3d at 280 n.12 ("[T]he notion that a structural error occurring prior to a guilty plea invalidates the subsequent guilty plea would be at odds with the

result in *Tollett*[.]"). Therefore, we conclude that Moody's *Faretta* claim is based on an independent, non-jurisdictional constitutional defect and is waived, because in pleading guilty he waived all such claims arising from alleged errors preceding his guilty plea.

4. In a related claim, Moody argues that, in addition to denying his right to self-representation, the trial court also prevented him from determining the objective of his defense in violation of the federal constitution. Moody relies on *McCoy v. Louisiana*, ___ U.S. ___ (138 SCt 1500, 200 LE2d 821) (2018), where the United States Supreme Court held that a defendant has a right under the Sixth Amendment "to decide . . . the objective of the defense," including "insist[ing] on maintaining [his or] her innocence at the guilt phase of a capital trial," and that a violation of this right constitutes structural error. 138 SCt at 1508, 1511. The trial court's challenged ruling, however, was issued before Moody's plea and, as a result, like his challenge to the court's *Faretta* ruling, has been waived by virtue

of his guilty plea.[12]

As discussed above, under both this Court's precedent and that of the United States Supreme Court, a voluntary guilty plea generally operates as a waiver of claims of constitutional error that occurred prior to the plea, even claims of structural error. See *Tollett*, 411 U.S. at 267; *Powell*, 309 Ga. at 528 (3) ("As a general rule, a guilty plea waives all defenses except that based on the

---

[12] When Moody first expressed his conflict with counsel during an ex parte hearing, he said that trial counsel had not "acknowledged" Moody's "theory of innocence" and that counsel, instead, "just want[ed] to go with what they ha[d] said" the strategy was. Trial counsel responded that he would meet with Moody and "ask him specifically what [wa]s his theory of the defense, and . . . take it from there." At a subsequent ex parte hearing held 20 days into jury selection, Moody's lead counsel told the trial court that Moody "want[ed] to contest guilt [and] innocence in this case," he "perceive[d] that [counsel we]re not contesting that based on the questions [they we]re asking the jurors" during voir dire, he was "exactly right in that regard," and he "just simply disagree[d]" with counsel's approach. At the *Faretta* hearing, trial counsel asserted that Moody's desire to represent himself was driven at least in part by his "disagreements with [counsel's] trial strategy," and Moody stated that counsel told him he had no "say-so" in the direction of his defense. On the first day of trial, trial counsel told the trial court that "Moody ha[d] expressed to [counsel] th[at] morning that he would prefer to pursue a not guilty by reason of insanity defense or a defense of simply not guilty," whereas "[t]he defense team believe[d] that the more appropriate strategy [wa]s to pursue a strategy that basically embrace[d] the notion of guilty but mentally ill[, which wa]s the strategy that [defense counsel was] prepared to present and that Mr. Moody disagree[d] with." In resolving the issue, the trial court concluded that this was a "strategy decision[] appropriately given to [the] attorneys." Given our conclusion of waiver, we express no view on whether the trial court was correct.

knowing and voluntary nature of the plea."). Like his *Faretta* challenge, Moody's *McCoy* claim is related to the manner in which he would have conducted his defense at trial, and it focuses on a ruling on a non-jurisdictional issue unrelated to his guilty plea, and that occurred prior to the entry of the guilty plea.

Moreover, "a valid guilty plea relinquishes any claim that would contradict the 'admissions necessarily made upon entry of a voluntary plea of guilty.'" *Class*, 138 SCt at 805 (quoting *United States v. Broce*, 488 U.S. 563, 573-574 (109 SCt 757, 102 LE2d 927) (1989)). A *McCoy* claim based on a defendant's alleged "intransigent objection to th[e] admission" of his guilt to a charged crime, 138 SCt at 1510, would contradict the admission actually made upon entry of his guilty plea to that crime. Therefore, we conclude that the trial court's ruling that Moody now challenges as violating *McCoy* did not render his guilty plea invalid, because in pleading guilty Moody waived all such non-jurisdictional errors leading up to his convictions except those affecting the validity of his plea.

5. Moody argues that the method of summoning jurors was

unlawful. But here as well, by pleading guilty, Moody "waived any claim he might have had concerning the jury selection process" with respect to the discontinued guilt/innocence phase of his trial. *Hooks v. State*, 233 Ga. 149, 150 (1) (210 SE2d 668) (1974) (citing *Tollett*, 411 U.S. at 267), vacated in part on other grounds by 433 U.S. 917 (97 SCt 2994, 53 LE2d 1104) (1977)). And for reasons discussed below, the trial court did not err in denying this claim as it applied to his sentencing.

(a) Moody challenged the formation of the petit jury, asserting that the Council of Superior Court Clerks ("Council") failed to comply with the Jury Composition Rule ("JCR"), which became effective on July 1, 2012, in that the Council's method for removing duplicate records did not comply with the JCR. He also contended that Fulton County had substantially altered the master jury list provided to it by the Council and thereby violated the JCR by improperly inactivating a substantial number of persons from the list.

At a hearing, Moody submitted as an exhibit the "Certificate of

Compliance for Fulton County" from the Council's vendor certifying to this Court that the vendor had complied with the JCR in the preparation of the 2012 Fulton County master jury list and that the list met the inclusiveness threshold specified in the JCR with an inclusiveness of 139 percent. See JCR ¶¶ 3, 4 (2012).[13] Moody's expert witness testified that Fulton County had inactivated 103,263 records on the list supplied by the Council, which did not "comport with" the JCR. According to Moody's expert witness's calculations, even after Fulton County's inactivations, the altered master list from which Moody's petit jury list was selected still contained 107,608 duplicate records, involving 53,798 duplicate persons,[14] and the altered master jury list was still 119 percent inclusive of the

---

[13] These citations are to the version of the JCR applicable to Moody's case, which became effective July 1, 2012, and which provided that "[e]ach county master jury list should be no less than 85% inclusive of the number of persons in the county population age (18) years or older as derived from the most recent decennial census or county population estimate (Table B01001) as of the date of this rule) from the United States Census Bureau for the calendar year when the list is generated." JCR ¶ 3 (2012). The JCR has been substantially amended since the time of Moody's sentencing trial.

[14] Moody's expert witness explained that the reason why the number of persons with duplicate records was not exactly half of the number of duplicate records was that a few of the "duplicate" records were actually "triplicates."

county population age 18 years or older based on the 2010 decennial census.[15] Moody's expert witness also testified that these duplicate records disproportionately involved whites. The trial court denied Moody's motion, summarily concluding "that the jury pool was properly constituted" and "properly apportioned" and that it "was not improperly altered by Fulton County."

After Moody's sentencing trial, we issued our decision in *Ricks v. State*, 301 Ga. 171 (800 SE2d 307) (2017), an interim appellate review decision (i.e., an appeal brought before trial) in which we concluded that Fulton County's 2013 and 2014 master jury lists had been altered by the county in violation of the JCR and remanded the case with direction to the trial court to ensure that the prospective jurors for the defendant's trial were drawn from a list that complied with the JCR and the relevant statutory provisions. See id. at 188-

---

[15] But see *Ricks v. State*, 301 Ga. 171, 182 (3) (a) n.9 (800 SE2d 307) (2017) (indicating that the same language in JCR ¶ 3 (a) in effect at the time that Moody's master jury list was compiled, which directed that population figures be "derived from the most recent decennial census or county population estimate," meant that the more recent of those two population figures, if available, should be used).

194 (5), (6). Moody included the trial court's denial of his petit jury challenge in his motion for new trial, contending that Fulton County committed the same type of violations committed in *Ricks* and that his Sixth Amendment fair cross-section right was violated as a result. The trial court denied Moody's motion for new trial, finding as to this particular claim that "there were no violations of the [JCR] which would have had the effect of vitiating the array" and that Moody "did not establish a prima facie case of a Sixth Amendment fair cross-section claim."

(b) In his initial brief to this Court, Moody claims that Fulton County's violations of the JCR "[c]onstituted an 'essential and substantial' [v]iolation of the [r]ules [g]overning [j]ury [s]election," but he does not argue that any specific jury selection statute was violated. In response to the Attorney General's brief pointing out that he had failed to identify a violation of a jury selection statute, Moody argues for the first time in his reply brief that the altered master jury list used by Fulton County *was not* the county master jury list actually compiled by the Council as required by OCGA §§

15-12-120.1 (providing that, "[o]n and after July 1, 2012, trial juries shall be chosen from a county master jury list") and 15-12-1 (5) (defining the term "'[c]ounty master jury list'" as "a list compiled by the council"). Moody contends that using the altered list to draw the array for his trial violated those provisions of the jury selection statutes. Pretermitting whether this additional argument is entitled to consideration, see *City of Atlanta v. Mays*, 301 Ga. 367, 372 (3) (801 SE2d 1) (2017) ("An appellant who raises an argument for the first time in a reply brief is not entitled to have that argument considered."), and also pretermitting whether a jury selection statute was actually violated, Moody's contention does not warrant reversal.

Since *Ricks* we have explained that "the primary objective of the JCR — to ensure that each county master jury list is 'no less than 85% inclusive' of the county's adult population — is a prophylactic measure that is not tied to any specific constitutional or statutory mandate." *Sinkfield v. State*, 311 Ga. 524, 529 (1) (858 SE2d 703) (2021). When a violation of the JCR is shown before trial,

51

a defendant may be able to obtain pre-trial relief requiring the JCR to be followed in his trial regardless of any showing of harm. See *Ricks*, 301 Ga. at 193 n.22 (5) (f). But the same is not true after trial; even if a "master jury list violated the JCR," there must ordinarily be "some showing of harm — that is, some probability that the error affected the outcome of the trial proceedings" — in order to warrant reversal on post-trial appeal. *Sinkfield*, 311 Ga. at 527 (1). That said, we have noted that "this Court has suggested — without expressly using the term 'structural error' — that automatic reversal may be warranted where an 'essential and substantial' provision of a jury selection *statute* has been violated[.] . . ." Id. at 528 (1). We have long held as a general matter:

> Statutes regulating the selection, drawing, and summoning of jurors are intended to distribute jury duties among the citizens of the county, provide for rotation in jury service, and are merely directory. Obviously, however, a disregard of the essential and substantial provisions of the statute will have the effect of vitiating the array.

*Al-Amin v. State*, 278 Ga. 74, 80 (7) (597 SE2d 332) (2004) (citation and punctuation omitted), overruled on other grounds by *State v.*

52

*Lane*, 308 Ga. 10, 23 (Appendix) (838 SE2d 808) (2020).

In *State v. Towns*, we recognized "that this Court never before ha[d] attempted to articulate a standard that clearly marks the line between the provisions of jury selection statutes that are 'essential and substantial' and those that are not." 307 Ga. 351, 355 (3) (834 SE2d 839) (2019). There, we explained that "our examination of the [applicable] cases le[d] us to conclude that, to the extent that a violation of the jury selection statutes affects the identity of the persons selected for the array from the universe of persons eligible to serve, it is a violation of an 'essential and substantial' provision." Id. Relying on *Towns* and on his expert witness's testimony that the identities of summoned jurors in his case would have been different if the master jury list had been properly created and maintained, Moody argues that Fulton County altered "the identity of the persons selected for the array from the universe of persons eligible to serve" by manipulating the master list originally compiled by the Council using "legacy data" and other means to add and delete names from that list.

Moody's argument is unavailing. In *Towns*, we determined that, "[i]n the absence of an articulated standard to mark the line, the best way to find the line is an examination of how we have applied the 'essential and substantial' test in prior cases, especially cases like [Towns's case] *that involve[d] the selection of a juror who likely would not otherwise have been chosen for the array.*" 307 Ga. at 355 (2) (emphasis added). In *Towns*, we also noted that, although "the persons summoned for service as petit jurors were selected at random from the master jury list," the clerk relied on her own *personal* knowledge about the prospective petit jurors in selecting two of them to be summoned for a grand jury that had an insufficient number of jurors, thereby violating the "random[ness]" requirement of OCGA § 15-12-66.1.  Id. at 354 (2).

Moody's alleged violation is nothing like the problem in *Towns*. This case is more like the situations we noted in *Towns* that involved circumstances in which no relief was warranted. See *Towns*, 307 Ga. at 555 (3) n.9. Indeed, several of those cases that we found distinguishable in *Towns* dealt specifically with the statutory

54

procedures for *creating* master jury lists, just as Moody's case does. In those cases, "so long as a jury list meets equal-protection and fair-cross-section standards respecting the inclusion of cognizable groups, 'the statutory procedures for creating the [master jury] list are merely directory,' and do not create a basis for sustaining challenges to the array." *Frazier v. State*, 257 Ga. 690, 691 (2) (362 SE2d 351) (1987) (citation and punctuation omitted); see also *Foster v. State*, 288 Ga. 98, 101 (2) (b) (701 SE2d 189) (2010) (holding that the fact that the master jury list was compiled by a board of jury commissioners that was comprised of only five instead of the six members required by former OCGA § 15-12-20 "did not rise to 'such disregard of the essential and substantial provisions of the statute as would vitiate the arrays'" (citation omitted)); *State v. Parlor*, 281 Ga. 820, 820-821 (642 SE2d 54) (2007) (holding that the statutory instruction to conduct a biennial revision of the grand jury list was merely directory); *Sealey v. State*, 277 Ga. 617, 618-619 (2) (593 SE2d 335) (2004) (holding that the statutory instruction to select the most upright and intelligent citizens for the grand jury was merely

directory), disapproved on other grounds by *Willis v. State*, 304 Ga. 686, 706 (11) (a) n.3 (820 SE2d 640) (2018); *Burney v. State*, 244 Ga. 33, 38 (3) (257 SE2d 543) (1979) (holding that former Code § 59-106 was directory only and thus evidence showing that the jury list had not been revised according to that statute's timetable and did not contain a number of names equal to 50 percent of the registered voters of the county as required by an amendment to that statute "[did] not invalidate the jury list or deprive defendant of any right to which he [was] entitled").[16] Therefore, even assuming that OCGA

---

[16] To further support this claim, Moody asserts that four white jurors who were selected to serve at his sentencing trial appeared as duplicate records on the master jury list used in his case. In the trial court, Moody alleged that it was as many as six jurors; the trial court never made a factual finding on this point. Moody states in a footnote of his brief to this Court that counsel made "[t]hese determinations by comparing the juror numbers associated with the jurors selected to serve[] with the information provided on the juror questionnaires" and then "cross-referencing that information against the list of duplicate records that appeared on the master jury list used in this case, which was admitted as Defense Exhibit 9 at the March 4, 2013, evidentiary hearing." Moody cites generally to two volumes of the record consisting of 4,145 pages and containing the juror questionnaires for approximately 491 prospective jurors in his case and to a defense exhibit admitted at the March 4, 2013, evidentiary hearing that consists of over 1,000 pages.

Pretermitting whether Moody has fully complied with Supreme Court Rule 22 requiring citations in parties' briefs to be "full and complete," we conclude that whether four white jurors with duplicate records served on Moody's jury is irrelevant. Even assuming that, as Moody's expert witness

§ 15-12-120.1 was violated in the manner that Moody alleges, Moody has not established a fair-cross-section violation, as discussed below, or that the alleged violation amounted to "such disregard of the essential and substantial provisions of the statute as would vitiate the array[]" to warrant automatic reversal. *Foster*, 288 Ga. at 101 (2) (b) (citation and punctuation omitted).

(c) Moody also argues that the master jury list used to summon jurors in his case violated the fair cross-section requirement in that African-Americans were unconstitutionally under-represented. "In

---

testified, drawing from a master jury list without duplicates would have resulted in a "different group" of summoned jurors, Moody has not shown that the four jurors who served on his jury would not have remained on a properly created and maintained master jury list and thus could not possibly have been selected for his array, and we deem the relevant unintentional increase in the probability that certain jurors would have been summoned for jury service to fall short of an essential and substantial violation of the general legal requirement of randomness in summoning potential jurors. See *Harper v. State*, 283 Ga. 102, 103-104 (1) (657 SE2d 213) (2008) (distinguishing between a "defect . . . in complying with the statutory directives governing *how* the jury commission should select grand jurors" and a defect "[w]here th[e] role of the jury commission ha[d] been entirely circumvented by the service of a grand juror it never selected for service, [which was] an 'essential and substantial' violation of the law" (citation and punctuation omitted; emphasis in original); *Dawson v. State*, 166 Ga. App. 515, 516-517 (2) (304 SE2d 570) (1983) (holding that a grand juror did not illegally serve where her name appeared on the master jury list, although it was not on the grand juror list for the term in which she served).

order to show a Sixth Amendment violation, [Moody] must show the group's cognizibility, under-representation, and systematic exclusion." *Humphreys v. State*, 287 Ga. 63, 68 (3) (b) (694 SE2d 316) (2010), disapproved on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3. Unquestionably, African-Americans are a "cognizable" group. See, e.g., *Williams v. State*, 287 Ga. 735, 735-736 (699 SE2d 25) (2010), superseded by the Jury Composition Reform Act of 2011 as noted in *Ellington v. State*, 292 Ga. 109, 118 (4) n.2 (735 SE2d 736) (2012), disapproved on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3. But Moody has failed to show any under-representation.

According to Moody's expert, whites age 18 years and over comprised 46.68 percent of the population of Fulton County and African-Americans age 18 years and over comprised 42.8 percent, each based on the 2010 decennial census. According to Moody's expert witness's calculations, non-duplicate whites on the altered Fulton County master jury list comprised 46.34 percent of the list, and non-duplicate African-Americans comprised 46.84 percent.

Nevertheless, Moody relies on his expert witness's testimony

that the duplicates on the Fulton County master jury list "had a higher chance of being selected," were "disproportionately white[,] and underrepresent[ed] African[-]Americans." In particular, according to Moody's expert witness's figures, the duplicates on the Fulton County master jury list were comprised of 56.81 percent whites and only 40.88 percent African-Americans. According to Moody's expert witness, the Council's master jury list was missing race codes for 64.97 percent of the persons on the list, but, as part of its alteration of the master jury list that it received from the Council, Fulton County "amend[ed]" the list to add race codes for a significant number of records on the list.[17] Even with the addition of Fulton County's race codes, however, Moody's expert witness testified that he could not provide the data needed regarding racial disparity in order to make a constitutional claim, explaining that although the disproportionality of whites in the duplicates "[wa]s going to cause a racial skew towards whites," it was "[r]eally hard to tell" what the

---

[17] It is unclear from the record where Fulton County obtained the information for the race codes that it added.

total impact of that skew would be. Moody's expert witness further explained that, "for the most part we don't know what everybody's race code is or what everybody's race that they've identified on the full list, either the [master jury list compiled by the Council] or the [the master jury list as altered by Fulton County]."

The absence of that data means that Moody failed to make a prima facie case. And because Moody did not make a prima facie case, his fair cross-section claim fails. See *Shubert v. State*, 306 Ga. 490, 492 (2) (831 SE2d 826) (2019) (holding that the defendant failed to carry his burden to make even a prima facie case for a fair cross-section claim because he had presented insufficient evidence to determine the racial composition of the relevant master jury list).

*Sentencing Trial*

6. Moody contends that the trial court erred in denying his motion for a mistrial based on juror misconduct. We disagree.

(a) During a recess on the morning of the third day of the sentencing trial, the trial court announced to the parties that it had received a note from Juror 142 asking to speak to the court. The trial

60

court then summoned the juror to a conference with the court and the parties. The juror, a registered nurse, then disclosed that, on returning home the previous evening, he had conducted an internet search on "sociopathic disorder" and "antisocial personality disorder." When the trial court asked him why he had conducted his search, the juror responded that, even though he had not heard those particular terms, the jury "ke[pt] hearing, you know, mental instability [t]here in the courtroom." He indicated that, while he had never been a psychiatric nurse, he had had "a psychiatric rotation in nursing school" and that he had been "curious as to just refreshing [his] memory" about diagnoses that he had previously learned about. He also explained that he told his fellow jurors that he had conducted his search and that, in response, "they all agreed that [he] should let [the trial court] know" what he had done. The trial court then asked him whether he had told the other jurors the substance of what he had learned from his search or whether he had discussed that information "at all" with them, and he answered unequivocally to both inquiries, "No, I did not."

61

The trial court then gave both parties the opportunity to question the juror. The State had no further questions, but during defense counsel's inquiry, the juror clarified that he had conducted independent research only on the previous evening and not throughout the proceedings and that he had informed the other jurors that he had conducted this research only during the recess that the trial court had taken shortly before the court had received his note. Defense counsel asked the juror to describe "the conversations" that took place regarding the research, and he responded, "Well, I basically asked them if they thought it was acceptable that I had looked at these two personality disorders on the internet." On further inquiry, the juror stated that he had named the term "sociopaths" during his conversation with the other jurors but that he did not believe that he had mentioned the term "antisocial personality disorder." Defense counsel then asked him how the other jurors "express[ed] their concerns to [him] about [his research]," and he said that "they just said that [he] should not have done that." When defense counsel began to ask him whether "any

62

particular juror sa[id] anything to [him] in the presence of the other jurors about this," the trial court intervened and said that the court had "heard what [it] need[ed] to hear."

After Juror 142 left the courtroom, both parties requested that he be removed, and the trial court agreed to do so. Then defense counsel suggested that the trial court inquire as to whether the other jurors "knew that [Juror 142 wa]s a nurse or [wa]s a medical professional of some sort." However, the trial court stated that this question was irrelevant given that any juror could have conducted the research regardless of his or her background. The trial court found that the relevant inquiry instead was whether Juror 142's actions and statements to the other jurors would "prevent [a juror] from making [a] decision based on what[ was t]here in the courtroom and following the court's instructions to make [a] decision in that regard." Defense counsel stated, "I understand," and did not argue further. The trial court then brought in one juror and asked:

> I know that Juror 142 asked a question in the presence of the other jurors about some internet search he had done, about whether he should bring it to the court's attention.

My question for you, is any of that conversation that you heard from him or anything about that, do you believe it would prevent you from doing what you are sworn to do as a juror, listen to the evidence, listening to my instruction, and making a decision based on those things?

The juror answered in the negative. After the trial court had completed its colloquy, defense counsel told the court that it was difficult to "analyze this issue" without "know[ing] exactly what [Juror 142] said, and . . . what [the other jurors] said to him." The trial court indicated that it was not going to make an inquiry into those matters, and defense counsel said that he understood. Defense counsel then requested that the trial court refrain from "admoni[shing the jurors] to obey [their] oath because . . . that ha[d] a tendency to direct them." The trial court stated its belief that it was acting appropriately and then returned to defense counsel's suggestion about making a further inquiry into what was said among the jurors. The trial court explained that it found Juror 142 credible, pointing out that "the only reason he was out" in the courtroom was to tell "[the trial court and the parties] what he did" and that the trial court saw no reason not to believe "what else he

64

told [them] about what he did." The trial court concluded that it "kn[e]w what was said based on what [Juror 142] told" the trial court and the parties in "the same report that brought [the misconduct] to [their] attention in the first instance."

The trial court then questioned each of the remaining jurors, with all the jurors being asked in a substantially similar manner. Each of the jurors responded that there was nothing in the conversation that would keep him or her from being fair and impartial and deciding the case on the evidence and the law. In addition, one juror volunteered that, "[i]f anything, [the conversation] ma[de the jurors] much more conscious of [their] duty." Another juror volunteered that "it was not a conversation" but that "[Juror 142] maybe said two sentences at the most." A different juror stated "[t]here was nothing specific said," and yet another stated that he "didn't even hear [Juror 142's] question." No juror indicated that the trial court's description of the circumstances of Juror 142's disclosure to his fellow jurors was incorrect.

After the trial court stated its intention to go forward, defense

65

counsel moved for a mistrial based on Juror 142's misconduct and the subject matter that he had researched. Defense counsel expressed particular concern "about the actual subject matter of [Juror 142's] inquiry, sociopath and antisocial personality disorder, given that there ha[d] been absolutely no testimony at th[at] point concerning that but that [defense counsel] anticipate[d] there, in fact, w[ould] be substantial testimony concerning those issues." The trial court denied the motion, finding that "[t]he jurors ha[d] clearly indicated that nothing about what happened, to the extent that they heard it, developed by the questioning, ha[d] affected their ability to be fair and impartial in the case" and concluding that therefore there was no basis for a mistrial.

(b)  We have recently explained:

> We review a trial court's denial of a motion for mistrial for abuse of discretion, and the trial court's exercise of its discretion will not be disturbed on appeal unless a mistrial is essential to preserve the defendant's right to a fair trial.  When reviewing a trial court's ultimate decision for an abuse of discretion, we review factual findings or credibility determinations underlying the court's decision only for clear error.

To set aside a jury verdict solely because of irregular jury conduct, a court must conclude that the conduct was so prejudicial that the verdict is inherently lacking in due process. Any juror irregularity that has the potential to injure a defendant's due process rights triggers a presumption of prejudice, and the prosecution must then carry the burden of establishing beyond a reasonable doubt that no harm occurred. To establish that the juror irregularity was harmless beyond a reasonable doubt, the State must show based on the record evidence that there is no reasonable possibility that the juror irregularity contributed to the [outcome of the proceeding]. As we have explained, the State may carry this burden by establishing that the juror irregularity was an immaterial irregularity without opportunity for injury.

*Charles v. State*, 315 Ga. 651, 657-658 (3) (___ SE2d ___) (2023) (cleaned up).

On appeal, Moody argues that "the substance of [Juror 142]'s research went directly to a central, disputed, inflammatory, and likely dispositive issue in the sentencing phase of the trial," i.e., whether he suffers from severe mental illness or instead from antisocial personality disorder. But that alone does not establish presumptive prejudice — after all, the trial court promptly excused Juror 142 after establishing that he did not share the substance of any of the information gleaned from his research with any of his

67

fellow jurors but instead immediately followed their advice to inform the trial court about what he had done.

Moody nevertheless argues that Juror 142 "shared [his] research with other jurors," who ultimately sentenced him to death, and that "[t]he trial court's limited inquiry into the misconduct did not provide the State with sufficient proof to rebut the presumption of prejudice that arose from this misconduct." Although the trial court did not question the remaining jurors as to what the specific conversation was that took place when Juror 142 told them that he had conducted internet research, Juror 142's testimony and the responses of the jurors to the trial court's inquiry, which were consistent with what Juror 142 described as having taken place, authorized the trial court to find that Juror 142 did not share what he had learned with the other jurors. Moreover, the trial court's questioning of each of the remaining jurors established that they could remain fair and impartial. This was sufficient to establish beyond a reasonable doubt that Juror 142's misconduct did not harm Moody. See *Jones v. State*, 258 Ga. 96, 97 (366 SE2d 144) (1988)

("[W]here the substance of the communication is established without contradiction, the facts themselves may establish the lack of prejudice or harm to the defendant."). Accordingly, the trial court did not abuse its discretion in denying Moody's motion for a mistrial. See *Burney v. State*, 309 Ga. 273, 292-294 (5) (845 SE2d 625) (2020) (holding that a juror's misconduct in conducting an online search for the terms "malice" and "malice murder" during the jury's deliberations in a murder prosecution was harmless beyond a reasonable doubt where the trial court found that the juror did not share what she had learned with her fellow jurors and that her misconduct did not impact any juror's assessment of the charges against the defendant, including her own); *Hodges v. State*, 302 Ga. 564, 568-569 (4) (807 SE2d 856) (2017) (holding that a juror's misconduct in looking up some words on a dictionary application during trial was harmless beyond a reasonable doubt, where the juror testified that the search had no impact on her as a juror and there was no evidence that she shared her search results with other jurors).

7. Moody contends that the trial court abused its discretion by allowing improper victim impact testimony from the grandmother and the mothers of the victims. For the reasons set forth below, we discern no reversible error.

(a) *Testimony of the Victims' Grandmother.* Over Moody's objection that the statements were in the format of poems to the victims, the trial court allowed the grandmother of Kimble and Mattox to read her victim impact statements to the jury.[18] In

---

[18] The grandmother stated:

The first one is my moonlight, and that's what Del was to me. Okay. It reads my moonlight, you will always be with me. I can always look out at night and see you glowing through the trees. On my mind you will always be my handsome grandson who was smart and very nice to me. One thing I know we all know for sure, you were --- we were all very proud of you. Nighttime, daytime, noontime, all the time I think of you. Loved ones can never be replace no matter what you do. I still miss you, and I wish you were here. But I know you're with God. You are happy there. God only knows what is best for us. When we look ---- when he took you home, it was a must. Heaven is your home now. Earth is mine, but we will be soon together when it is time. The time will come, we will meet again, and we will all see each other in that Great Promised Land.

Okay. And this is to my sunshine, Sierra Kimble. Sunshine, my sweet, shining, beautiful sunshine, your love --- your love and your smile will always be for the --- will be with me for a lifetime.

overruling Moody's objection, the trial court noted that a grandmother's testimony about what it meant to her to lose her grandchildren "[wa]s about as poignant as it can get." However, the trial court found that the statements were "not ploys for sympathy" or "overly prejudicial." We agree. Both statements were very brief descriptions of the victims' unique qualities that endeared them to their grandmother and her longing to see them again, and they were proper testimony. See *Bryant v. State*, 288 Ga. 876, 897 (15) (a) (708 SE2d 362) (2011) (explaining that this Court has deemed victim impact testimony describing the victim's life and the impact of his or her loss on his or her family as being appropriate); *Lawler v. State*,

Understanding why you had to leave so soon is very hard, but to be absent from the body is to be present with God. Never will I forget you. You will always be in my heart. When I think of you, it is so hard being apart. Sun --- shining sunshine, my sweet sunshine, shining forever you will always be with me and leave me never. Heaven is your home. I do understand. You are with God waiting for me with open hands. I can see you now working and helping others out. That is what you do. That is what you are about. Now I know you that you are now resting in peace. Everlasting life is what we all have to look forward to, also getting to heaven and meeting up with you.

71

276 Ga. 229, 232 (3) (576 SE2d 841) (2003) (stating that victim impact testimony is not unconstitutional simply because it is poignant or sad).

Nevertheless, on appeal Moody now asserts that these statements were "emotionally-charged" due to their figurative language and "religious references to '[G]od,' 'heaven,' and 'everlasting life.'" Relying on *Livingston v. State*, 264 Ga. 402, 404 (1) (b) (444 SE2d 748) (1994), Moody argues that the statements were improper because they inflamed and unduly prejudiced the jury. But in *Livingston*, our point was that "even some [otherwise-] legitimate victim impact evidence could inflame or unduly prejudice a jury *if admitted in excess*." 264 Ga. at 404 (1) (b) (emphasis added). That did not happen here, as the statements at issue each comprised merely a half-page of transcript. The language used by the victims' grandmother, such as references to her granddaughter as her "sunshine" and to her grandson as her "moonlight" and to her religious belief in life after death, is not the type of language that would unduly inflame or prejudice a jury. See *Turner v. State*, 268

72

Ga. 213, 215 (2) (b) (486 SE2d 839) (1997) (no error in admitting victim impact statements that were brief, "covering less than two pages of transcript each," that "focused on the witnesses' relationship with the victim and how the victim's death had affected the witness personally," and that made "extremely brief" references and did not inflame the "jury based on religion"); *Livingston*, 264 Ga. at 404 (1) (b) (noting that this Court has held that "'the passion' proscribed by our law does not encompass all emotion, but only that engendered by prejudice, particularly racial prejudice . . . or [prejudice towards] religious preference,' or other arbitrary factors" (citation omitted)). Therefore, this claim has no merit.

(b) *Testimony of the Victims' Mothers.* Moody also claims that the trial court committed reversible error by admitting the victim impact testimony of the victims' mothers to the extent they contained statements that can be construed only as pleas to the jury to recommend a death sentence. "It is settled law that testimony by relatives of a victim concerning the appropriate sentence is not properly admissible in a death penalty case as victim-impact

73

testimony." *State v. Worsley*, 293 Ga. 315, 328 (5) (745 SE2d 617) (2013).

But because Moody raised no objections to either of these statements at trial, his claims are not preserved for ordinary appellate review and can be reviewed only for plain error. See *Williams v. State*, 315 Ga. 490, 494 (2) n.7 (883 SE2d 733) (2023) (holding that an unobjected-to ruling on admitting or excluding evidence is subject to plain error review under OCGA § 24-1-103 (d) even if the basis for the ruling is governed by the Constitution or by a statutory provision outside the Evidence Code). Under plain error review, we apply the four-pronged analysis articuled in *State v. Kelly*:

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the *discretion* to remedy the error – discretion which

74

ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011) (cleaned up); see also

*Martin v. State*, 298 Ga. 259, 279 (6) (d) (779 SE2d 342) (2015)

(noting that this Court's obligation under OCGA § 17-10-35 (c) (1) to

conduct a plenary review in all death penalty cases "guards against

any obvious impropriety at trial, whether objected to or not, that in

reasonable probability led to the jury's decision to impose a death

sentence"), disapproved on other grounds by *Willis*, 304 Ga. at 707

(11) (a) n.3. Thus, under *both* the plain error review of *Kelly* and the

plenary review of Moody's death sentences under OCGA § 17-10-35

(c) (1), relief here would be warranted only if there is a reasonable

probability that the improper victim impact testimony in this case

led to the jury's decision to impose Moody's death sentences.

The victim impact testimony contained language of the sort

that we previously have deemed improper. In her victim impact

statement, Rhonda Mattox, who was Mattox's mother and Kimble's

aunt, stated that "[her] hope [wa]s that the jury w[ould] punish the

defendant to the fullest extent." Zondra Mathis, who was Kimble's mother and Mattox's aunt, said the following:

> I just said to myself I don't want them[19] to die because of what – because of the heart that I have. But I want them to really pay for what they had done and taken my baby through. My emotion has changed to someone that I don't want to be, and I would have never wanted to think the way that I'm thinking these days. I'm just asking for – I'm just asking that they be punished to the fullest. I know that that won't bring my sunshine back to me, but it would give me that knowledge, the knowledge that justice was served.

Although Mathis's testimony was somewhat ambiguous — defense counsel argued in closing that she had asked the jury not to impose the death penalty — Mathis and Mattox nevertheless made statements calling for "justice" and a "punish[ment] to the fullest" extent of the law, which we have ruled are improper. See *Martin*, 298 Ga. at 285 (9) (victim impact testimony "refer[ring] to the family's desire for 'justice'" was improper), disapproved on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3; *Worsley*, 293 Ga. at 328 (5) (statements that the defendant should receive the

---

[19] By using the pronouns "them" and "they," Mathis was apparently referring to Moody and his co-defendant, Felts.

76

"maximum" or "ultimate" sentence were "implied requests for the jury to recommend the death penalty").

Any errors in allowing this testimony, however, did not affect Moody's substantial rights. In the light of the overwhelming evidence, the nature of Moody's crimes, the brevity of the improper testimony, the fact that the improper testimony was not explicit or especially inflammatory, and the fact that Mathis's testimony was ambiguous enough that defense counsel used it in closing argument as showing that she was against death sentences for Moody, there is no reasonable probability that the challenged portions of the testimony led to the jury's decision to impose death sentences for Moody. See *Martin*, 298 Ga. at 285 (9) (affirming the defendant's two death sentences after applying plain error review pursuant to OCGA § 17-10-35 (c) (1) to improper victim impact testimony "refer[ring] to the family's desire for 'justice,'" along with other improper testimony not objected to at trial).

8. Moody next argues that the prosecutor engaged in several acts of misconduct in an effort to undermine his neurological defense

77

that he suffers from organic brain damage. To prevail on a claim of prosecutorial misconduct, a "defendant must show [both] actual misconduct and demonstrable prejudice to his right to a fair trial." *Cushenberry v. State*, 300 Ga. 190, 195 (2) (b) (794 SE2d 165) (2016) (citation and punctuation omitted). We conclude for the various reasons discussed below that Moody has failed to make such a showing.

(a) *Alleged Misconduct in Attacking the Credibility of Moody's Expert Witness.* Moody first claims that the prosecutor improperly attacked the credibility of his out-of-state expert neurologist, Dr. Thomas Hyde, by suggesting that Dr. Hyde had acted wrongly in failing to notify the Georgia Composite Medical Board before working on Moody's case. Moody claims this constituted improper impeachment.

Shortly into his cross-examination of Dr. Hyde, the prosecutor confirmed that Dr. Hyde was not a psychiatrist but instead practiced medicine in the state of Maryland with "part of [his] expertise" being neurology. Then the following colloquy took place:

78

PROSECUTOR: So when you came here to work on Jeremy Moody, did you call the state board here in Georgia?

DR. HYDE: No. It's not necessary as an expert to call the state board.

PROSECUTOR: To testify. But to actually review and meet with the victim – I mean the defendant in this case, didn't you have to get a waiver in order to practice medicine in the state?

DR. HYDE: I'm not practicing medicine. I'm offering an expert opinion.

PROSECUTOR: Well, didn't you have to practice medicine to do your neurological review?

DR. HYDE: I have never in any state ever been told that you have to contact the state medical board in order to be an expert witness, and I've been qualified as an expert in Florida, Virginia, Maryland, Pennsylvania, Georgia in the past, and North Carolina.

PROSECUTOR: And you actually did medical work in state prior to testifying?

DR. HYDE: I examined, interviewed, and prepared reports on patients.

PROSECUTOR: You may want to consult with the state board because –

DR. HYDE: Is that a threat, sir?

PROSECUTOR: No, it's not. I'm – you're telling me, doctor, that you're not aware of it, so I'm telling you [that] you many want to do that.

At that point, defense counsel objected on the basis that the prosecutor's line of questioning "[wa]s not a proper line of cross-examination." The trial court told the prosecutor that he had "made

79

[his] point," and the prosecutor moved on.

During subsequent cross-examination about Moody's past medical records indicating that he suffers from antisocial personality disorder, the exchange between the prosecutor and Dr. Hyde became heated. After sending the jury out of the courtroom, the trial court admonished the prosecutor to "ask[] questions without testifying or making . . . out of hand remarks to the witness." At that time, Dr. Hyde stated to the trial court that he "ha[d] never been threatened by a state prosecutor, overtly or covertly," that he would be reported to the State Medical Board "for practicing without a license," and that he was unaware of a requirement that an out-of-state expert witness had to be licensed to practice medicine in Georgia before he or she could perform an evaluation for purposes of testifying in court. When questioned by the trial court, the prosecutor could not provide a basis for his questioning of Dr. Hyde regarding the State Board issue. Defense counsel subsequently asked the trial court to "tell the jury [that] whether [Dr. Hyde i]s licensed or not is not an issue that they should be concerned about."

However, the trial court declined to do so and suggested that this was a matter for defense counsel's redirect examination. Defense counsel raised no objection to the trial court's basis for refusing to instruct the jury pursuant to his request.

Assuming that Moody preserved this claim for the purposes of ordinary appellate review, see *Jeffers v. State*, 290 Ga. 311, 314 (4) (a) (721 SE2d 86) (2012) (holding that a party must "make and obtain a ruling on an objection to evidence in the trial court, before or as the evidence is admitted, in order to preserve the objection for appeal" and is "allow[ed] to raise on appeal only the same objections that were properly preserved below" (citation omitted)), we first note that the fact of whether Dr. Hyde was licensed in Georgia was a legitimate area of inquiry. See *Brooks v. Green*, 277 Ga. 722, 723-724 (2) (594 SE2d 629) (2004) (stating that "the possession of a license in Georgia does not go to qualification as an expert witness but may go to the weight and credibility that a factfinder gives to such expert's opinion" (cleaned up)).

Although the prosecutor's line of questioning suggesting that

81

Dr. Hyde was required to contact the State Medical Board before evaluating Moody as an expert witness was not backed by legal authority, we need not resolve that because there was no prejudice resulting from it. The questioning was promptly ended by the trial court, the prosecutor conceded during closing arguments that he was not challenging Dr. Hyde's credentials, and the prosecutor made no further mention of the State Medical Board issue. Thus, even if the prosecutor's questioning was improper, Moody has failed to show "demonstrable prejudice" resulting from this brief inquiry. See *Brooks v. State*, 305 Ga. 600, 606 (3) (826 SE2d 45) (2019).

(b) *Alleged Misconduct Regarding a State's Expert Witness.* Moody also contends that the prosecutor engaged in misconduct during the State's rebuttal case by calling Dr. Matthew Norman, a psychiatrist Moody claims had performed only "a sanity evaluation" of him, to testify that he disagreed with Dr. Hyde's neurological examination of Moody. Moody asserts that calling Dr. Norman as a rebuttal witness was misconduct for two reasons. Pretermitting whether Moody preserved this claim, neither reason offered by

82

Moody has merit.

(i) First, Moody contends that it was misconduct to call Dr. Norman in rebuttal, because Dr. Norman had been retained to testify only in the event that Dr. Glen Egan, a clinical psychologist, was unavailable. Moody argues that, because Dr. Egan had already testified in the State's rebuttal case, the prosecutor's use of Dr. Norman's testimony constituted an improper attempt (procedurally and substantively) to discredit Dr. Hyde. But this claim is plainly contradicted by the record.

The State moved the trial court for an order appointing Dr. Norman to conduct a psychiatric evaluation of Moody after Dr. Peter Ash, *not Dr. Egan,* announced that he would be out of the country and unavailable during the timeframe in which his testimony might be required.[20] Moreover, in response to the State's request, the trial court ordered that

> a qualified medical professional of the State's choosing, [namely,] Dr. Matthew Norman, conduct an evaluative examination of [Moody] and provide to the Court a report

---

[20] Dr. Ash, the psychiatrist who had initially performed a court-ordered evaluation of Moody, did not testify at Moody's trial.

of diagnosis, prognosis and its findings with respect to:

1. Degree of Criminal Responsibility or Mental Competence at the Time of the Crime . . . [, and]

2. Any other recommendations for disposition.

The trial court further ordered that, upon completion, Dr. Norman's report should be provided only to the trial court, which would place it under seal, and further ordered the following: if "the defense determine[d] that it w[ould] present expert [mental health] testimony at trial, the defense w[ould] disclose to the State the totality of the information and documentation used by any expert the defense [wa]s relying on to support its position, including any report generated by that expert"; "Dr. Norman w[ould] then be allowed to review said materials and amend his report and/or re-evaluate [Moody] as he deem[ed] appropriate"; and "all materials w[ould] then be provided to the State." Therefore, the record shows that Dr. Norman was explicitly appointed by the trial court for the State to present as a rebuttal witness in the event that Moody presented any expert mental health testimony at trial. See *State v. Johnson*, 276 Ga. 78 (576 SE2d 831) (2003) (discussing procedures

for a trial court to order the State's expert's examination of a defendant, the sealing of an expert's report, and the unsealing of it in order for it to be used for rebuttal purposes if the defense presents expert mental health testimony at trial).

Moreover, at the sentencing trial, in anticipation of Dr. Hyde's testimony, the prosecutor identified Dr. Norman as "an expert witness that [the State] m[ight] call in rebuttal," gave notice to the defense and the trial court that the State "would have him in [the courtroom] to assist" the State during Dr. Hyde's testimony, and requested that "before [Dr. Hyde's] cross-examination [the State] have just a five-minute recess so [that the prosecutor] c[ould] consult with Dr. Norman." Defense counsel stated that he considered the State's request "appropriate" and that he had no objections. Therefore, given the evidence in the record showing that the parties clearly understood that Dr. Norman was to testify in rebuttal to any mental health testimony that Moody might present, this portion of Moody's claim of prosecutorial misconduct is meritless.

(ii) Moody also contends that it was beyond the scope of Dr.

85

Norman's expertise and his evaluation of Moody to attack the professional opinions of Dr. Hyde that Moody suffers from organic brain damage or a seizure disorder.[21] This claim also fails.

After conducting an interview of Moody and reviewing numerous records, including his mental health records and evaluations, Dr. Norman diagnosed Moody as having antisocial personality disorder, cocaine dependence "in full sustained remission in [a] controlled environment," and borderline personality traits. Dr. Norman testified that his diagnosis of antisocial personality disorder was based on his interview with Moody and his review of Moody's records showing "that there was a personality disorder diagnosis . . . that was solidly, in [his] opinion, documented" at ages 13, 15, and 17 years "and that there was . . . consistency within that documentation from multiple different clinicians." Dr.

---

[21] Dr. Hyde testified that he did not make a psychiatric diagnosis of Moody but he opined that Moody suffers from organic brain dysfunction. With regard to Dr. Norman's diagnosis of antisocial personality disorder, Dr. Hyde testified that "there are other diagnoses that are a better fit than antisocial personality disorder, although [Moody] has traits that can be assigned within what are characterized as antisocial traits." Dr. Hyde opined that, "probably," meaning "[m]ore likely than not," Moody's psychiatric problems "are caused by and reflect [his] underlying organic brain damage."

Norman explicitly disagreed with Dr. Hyde's findings that Moody had organic brain damage, explaining:

> In my review of the records and seeing the consistency from so many different other clinicians for a nearly 20-plus year timeframe of having diagnoses of antisocial personality disorder, borderline personality disorder, conduct disorder, cocaine dependences, what was replete through the records that the best fit diagnosis is the antisocial personality disorder with borderline traits and the cocaine dependence.

At the time of Moody's sentencing trial, former OCGA § 24-7-707 governed the admissibility of expert opinion testimony in criminal proceedings, and that statute provided:

> In criminal proceedings, the opinions of experts on any question of science, skill, trade, or like questions shall always be admissible; and such opinions may be given on the facts as proved by other witnesses.[22]

Moody has not cited a single case, nor are we are aware of one, in which we have held that testimony regarding brain damage fell

---

[22] The General Assembly repealed OCGA § 24-7-707, effective July 1, 2022, and the admissibility of expert opinion testimony in both civil and criminal proceedings commenced on or after that date is now governed by OCGA § 24-7-702 with a few exceptions not relevant here. See Ga. L. 2022, p. 201, §§ 1-3. Former OCGA § 24-7-707 was carried over from its predecessor, OCGA § 24-9-67; therefore, when interpreting former OCGA § 24-7-707, it is appropriate to rely on decisions under OCGA § 24-9-67. See *Mosby v. State*, 300 Ga. 450, 453 (2) n.2 (796 SE2d 277) (2017).

outside the appropriate scope of expert testimony from a psychiatrist, and, in fact, our cases suggest just the opposite. See *Turpin v. Lipham*, 270 Ga. 208, 217 (3) (B) (3) (510 SE2d 32) (1998) (relying on "affidavits of several psychologists and *psychiatrists* who testified [in the habeas proceedings] that test results contained within the institutional records . . . suggest[ed] organic brain damage centered in the left hemisphere and post[-]traumatic stress disorder" to conclude that trial counsel's investigation of available mitigation evidence was not reasonable and therefore was deficient (emphasis added)); *Wellons v. State*, 266 Ga. 77, 82 (2) (463 SE2d 868) (1995) (relying in part on the testimony of a death penalty defendant's expert psychologist "acknowledg[ing] . . . that Wellons was also evaluated by a court-appointed *psychiatrist*, who concluded that Wellons is an intelligent, well-educated man with a significant personality disorder but no brain damage and no psychosis" to conclude that "the evidence as a whole demonstrate[d] that his defenses of insanity and mental illness were simply not viable" (emphasis added)); *Heard v. State*, 248 Ga. 348, 349 (283 SE2d 270)

(1981) (stating that the defendant offered the testimony of a forensic *psychiatrist*, who opined that he was "suffering from some brain damage" (emphasis added)). Moreover, it was for the jury "to judge the credibility of the opposing expert witnesses." *Tye v. State*, 298 Ga. 474, 477-478 (2) (a) (782 SE2d 10) (2016).

Moody also asserts that Dr. Norman was not qualified to disagree with Dr. Hyde "about whether there was evidence that [he] suffered from a seizure disorder." Dr. Hyde explained that he was using the term "seizure" as "the neurological term, which is normal involuntary discharge of electrical activity from a damaged or abnormal part of the brain that spreads to normal tissue[,] interrupting the normal function of that part of the normal tissue of the brain." He also affirmed that, although since 2003 Moody had had multiple clinical evaluations for seizures at Grady Memorial Hospital, he "never saw an EEG report, which is a test that is done to assay electrical activity in the brain," and that he "would have liked to have seen" such a report. Even so, after noting Moody's history of seizures, Dr. Hyde opined that a seizure disorder was

89

additional evidence of brain damage. Although Dr. Norman also acknowledged Moody's history suggesting a seizure disorder, he did not diagnose Moody with that disorder. When asked whether he saw anything in the documents that he had reviewed that "definitively said that [Moody] had a seizure disorder," Dr. Norman responded that he found it significant that, in reviewing those documents, which included Dr. Hyde's report," he had seen no "documentation of an EEG," which would show the "electrical activity that Dr. Hyde [described] that you need to actually have a seizure." We see no impropriety in Dr. Norman's testimony.

(c) *Alleged Misconduct Involving the Solicitation of Opinion Testimony.* Moody contends that the prosecutor also engaged in misconduct by eliciting improper opinion testimony from three of the State's lay witnesses and two of its expert witnesses. We reject this claim.

(i) *Lay Witness Testimony.* Moody contends that the prosecutor committed misconduct by eliciting from two Fulton County jail nurses and a former Fulton County jail officer improper "medical

90

opinion testimony designed to rebut [his] expert testimony." Under OCGA § 24-7-701 (a) ("Rule 701 (a)"), a lay witness may testify "in the form of opinions or inferences that are rationally based on the witness's perception, helpful to a clear understanding of the determination of a fact in issue, and not based on scientific, technical, or other specialized knowledge." *Bullard v. State*, 307 Ga. 482, 491 (4) (837 SE2d 348) (2019) (citation and punctuation omitted). "[L]ay witnesses may draw on their professional experiences to guide their opinions without necessarily being treated as expert witnesses." Id. at 492 (4) (citation and punctuation omitted).

*Jail Nurse Michelle McClure.* First, Moody points to the testimony of jail nurse Michelle McClure regarding his alleged mental deficiencies and seizure disorder. Even if this claim of error was preserved, Moody has not shown that this testimony was improper, and thus the prosecutor did not commit misconduct by eliciting it.

During her testimony, McClure affirmed that she had had

91

opportunities during Moody's years of incarceration to have conversations with him, that he appeared to know what was going on when she talked with him, that she had never heard him speak nonsensically, and that he did not appear to be "mentally deficient in some way." She explained that she thought Moody was "very smart" based on the fact that he "ask[ed] a lot of questions about" his medications, including asking about their side effects and requesting "printouts" for them. McClure also testified that she had never observed Moody actually having a seizure but that she had been among the medical staff who had responded after he had reportedly had one and that Moody had appeared "[a]wake and alert" and that he had "ranted." She testified that this was not typical in her experience, which was that "[a] lot of people" were "confused" and "not really aware of their surroundings when they c[a]me out of the seizures."

McClure's testimony was rationally based on her personal observations of Moody and her experience with other patients and did not require scientific, technical, or other specialized knowledge.

92

Her testimony was also relevant to two issues in Moody's case — what his mental condition was and whether he suffered from a seizure disorder. Accordingly, as this testimony was admissible under Rule 701 (a), the prosecutor plainly did not commit misconduct by eliciting it.

*Jail Nurse Angelica Rosant.* Moody also alleges that the prosecutor elicited improper opinion testimony when he asked another jail nurse, Angelica Rosant, whether, "based on [her] training and experience in the jail and having spent time with Mr. Moody, . . . he appear[ed] to have brain damage or brain injuries" and she responded in the negative. Defense counsel immediately objected on the ground that Rosant was "not qualified to testify as to whether or not [Moody] has brain damage." The trial court instructed the prosecutor to rephrase his question, and the prosecutor's rephrased questions were asked and answered without objection.

Although the court asked the prosecutor to rephrase the question, it never informed the jury as to whether or not Moody's

objection was sustained. Nevertheless, because Moody never requested a curative instruction for the jury to disregard the challenged testimony, we review his argument for plain error. See *Wynn v. State*, 313 Ga. 827, 838 (4) (874 SE2d 42) (2022). Moody's claim fails under such review.

Rosant's testimony was not obviously improper. She was asked whether Moody *appeared* to have brain damage or brain injuries based on her training, experience, and time spent with Moody, and she previously testified without objection about her observations about whether Moody understood everything she told him. See *Bullard*, 307 Ga. at 491 (4).

Even if her opinion testimony was improper, Moody has failed to show prejudice. In response to rephrased questions, Rosant testified without objection that she had never seen Moody walk with a limp "[i]n the times" that she had been with him, that she had personal experience with stroke victims and that he did not appear like a person who had suffered a stroke, that he communicated "[v]ery well" with her, and that he was able to provide "paperwork"

94

to her. This subsequent testimony was not improper. It was rationally based on Rosant's personal observations of Moody and her experience with other patients, it did not require specialized knowledge, and it was relevant to determining what Moody's mental condition was, which was a fact at issue at his sentencing trial. See *Bullard*, 307 Ga. at 491-492 (4); see also *Harris v. State*, 309 Ga. 599, 604 (2) (a) (847 SE2d 563) (2020) (holding that a detective's opinion that the defendant shot himself in the leg was admissible under Rule 701 (a), as it was rationally based on inferences that the detective formed from his review of the evidence and his prior observations of gunshot wounds, which did not require scientific, technical, or other specialized knowledge). Therefore, given the propriety of this testimony and the trial court's response to defense counsel's prompt objection to the prosecutor's initial question, we conclude that there is no reasonable probability that the prosecutor's allegedly improper question and Rosant's response to it contributed to the jury's decision to impose Moody's death sentences. See *Martin*, 298 Ga. at 279 (6) (d).

*Jail Officer Ricardo Rucker.* Lastly, Moody contends that the prosecutor elicited an improper lay opinion from former Fulton County jail officer Ricardo Rucker that "Moody like[d] to plan his seizures." This testimony occurred when the prosecutor asked Rucker whether he had "ever notice[d] if [Moody] ever had any seizures," and Rucker responded:

> Yes, sir. Now, I mean, I know it was a time he probably had a couple around me, but during my time with him I've noticed that Mr. Moody likes to plan his seizures and like just plan out the day. . . .

Even if Moody preserved this claim for review, the statements were admissible because they were based on Rucker's personal observation. According to Rucker, Moody's "plan" to have a seizure began when Rucker was in "the tower" with the microphone on and heard inmates talking with one another, with one saying, "Hey, when they get ready to do the round, I'm going to say you [are] having a seizure, and then you go through the routine." Then Rucker testified, "[A]s soon as [I] walk[ed] in the zone, everybody [was] beating on the door, hey, Moody [is] having a seizure." He also

96

described seeing "soap . . . squished up and made like it's throw up to the side," and he testified that, when medical personnel came to render aid to Moody, they reported that he was "good." He also testified that he "ha[d] not seen [Moody have] a seizure where it required any type of medical attention." Furthermore, according to Rucker, when Moody realized that jail personnel would not remove him from his cell to treat his seizures, he started injuring himself in ways that would necessitate his being taken to the jail's medical facility or to the hospital. As an example, Rucker described an occasion when Moody mentioned getting a "vacation" or "break" and then, shortly afterward, seriously injured his head, requiring a trip to the hospital.

To the extent that Rucker provided opinion testimony, it was rationally based on his personal observations of and experiences with Moody and did not require scientific, technical, or other specialized knowledge, and it was relevant to an issue in Moody's case — whether he was malingering. See *Bullard*, 307 Ga. at 491 (4). Because this testimony was admissible under Rule 701 (a), there

was no prosecutorial misconduct in eliciting it.

(ii) *Expert Witness Testimony.* Moody contends that the prosecutor also committed misconduct by eliciting improper testimony from the chief medical examiner and from the State's expert clinical psychologist. Even if preserved, the claims here are meritless, as Moody has not shown that any of this testimony was improper and thus that the prosecutor committed misconduct by eliciting it.

*Chief Medical Examiner.* Moody asserts that the prosecutor committed misconduct by eliciting improper testimony from Dr. Michele Stauffenberg, the chief medical examiner. First, Moody contends that the prosecutor elicited improper testimony from Dr. Stauffenberg in which she "repeatedly speculated" about the pain that the victims suffered. But this was a subject within a medical examiner's area of expertise, and the testimony was highly relevant to the jury's determination regarding the existence of the statutory aggravating circumstances in this case. See *Walker v. State*, 281 Ga. 157, 157, 159 (1), 166 (14) (635 SE2d 740) (2006) (noting the medical

examiner's testimony that the victim "suffered painful blunt force injuries to the head . . . and . . . a painful bullet entry through her wrist" in our review of the evidence supporting the section (b) (7) statutory aggravating circumstance involving torture); *West v. State*, 252 Ga. 156, 160-161 (313 SE2d 67) (1984) (providing a suggested jury instruction "clarifying the statutory language of the (b) (7) aggravating circumstance['s]" component involving torture).

Moody also contends that the prosecutor committed misconduct by eliciting testimony from Dr. Stauffenberg identifying a screwdriver that was not the *actual* murder weapon as being consistent with what had caused the victims' injuries. The purpose of this testimony was to lay the foundation for the admission of the screwdriver as a "demonstrative exhibit." Demonstrative evidence includes replicas or other devices "'used to aid the trier of fact in understanding the issues and facts at trial.'" *Smith v. State*, 299 Ga. 424, 434 (3) (b) (788 SE2d 433) (2016) (citation and punctuation omitted). We have explained that:

> Demonstrative evidence . . . must be relevant, see OCGA

§ 24-4-401, and it may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence, see OCGA § 24-4-403.

Id. at 434-435 (3) (b).

It is generally permissible to admit a weapon for demonstrative purposes, as long as a proper foundation is laid, and the challenged statements here were necessary to lay that foundation. Dr. Stauffenberg testified that the screwdriver was similar to the implement that caused the victims' injuries. See *Robinson v. State*, 308 Ga. 543, 547-548 (2) (a) (842 SE2d 54) (2020) (holding that the admission of two firearms for demonstrative purposes was not improper, where the State's evidence was sufficient to lay a foundation of similarity between those firearms and the gun that shot the victim and it was made clear to the jury that the firearms used at trial were not the actual firearms used in the alleged crimes).

Moody takes issue with the prosecutor having displayed the screwdriver during closing argument. But the prosecutor made clear

100

that the screwdriver was "solely" an "aid." See *United States v. Aldaco*, 201 F3d 979, 986-987 (III) (B) (2) (7th Cir. 2000) (holding that prejudice is minimized when the government makes clear to the jury that the replica is not the actual murder weapon possessed by the defendant); see also *United States v. Garvin*, 88 Fed. Appx. 542, 544 (3rd Cir. 2004) (holding that the district court did not abuse its discretion in allowing the government to use representative currency as demonstrative evidence during closing argument of a drug prosecution, where the government clearly informed the jury that it was not the actual currency seized from the defendant but was in the same denominations to show what that amount looked like).[23] Therefore, Moody's claim here fails.

*State Psychologist.* Moody also alleges that the prosecutor elicited improper testimony from Dr. Glen Egan, a psychologist who worked in the Emory University School of Medicine's Department of

---

[23] See *Rickman v. State*, 304 Ga. 61, 64 (2) (816 SE2d 4) (2018) (stating that, because provisions of the current Evidence Code governing the admission of demonstrative evidence mirror the Federal Rules of Evidence, the interpretation of those provisions is guided by the decisions of the federal appellate courts).

Psychiatry. Dr. Egan was qualified to testify as an expert on behalf of the State in the field of clinical and forensic psychology in rebuttal to the testimony of Moody's expert neuropsychologist, Dr. Barry Crown. Moody contends that it was improper for the prosecutor to elicit testimony that Moody did not exhibit signs of "brain damage or brain disorder" despite the fact that Dr. Egan was not a neurologist and did not conduct neuropsychological testing of Moody.

When the prosecutor initially asked Dr. Egan whether Moody "exhibit[ed] signs in any way, shape[,] or form that le[d] him to believe that [Moody] ha[d] some type of brain injury, brain damage[,] or any kind of brain disorder," Dr. Egan stated that he was not a neurologist and "did not do any kind of neurological evaluation" of Moody. Then he began to list the records regarding Moody that he had reviewed for "any indication that [Moody] showed any kind of signs of brain damage either on CT-scans or anything like that." At that point, defense counsel objected on the basis that Dr. Egan was testifying outside the scope of his qualifications. The trial court

offered the prosecutor an opportunity to inquire as to Dr. Egan's qualifications specific to this question, but the prosecutor maintained that his question had been whether Moody "exhibit[ed] anything consistent [with brain damage], not whether he actually had [brain damage] or not." In response, the trial court suggested that the defense's objection was aimed "more to the breadth of Dr. Egan's testimony" and suggested that the prosecutor direct Dr. Egan appropriately.

Even if this claim were preserved, it is meritless.

After the trial court's directions, the following colloquy ensued:

Q: And, Doctor, my question is, based on your background, training, and education over these many years, did the defendant exhibit signs consistent with someone who you believed or that you could say in any way, shape or form suffered from some type of brain damage or brain disorder?
A: From the information that I have – and the reality of the situation is I'm the one who does all of the neuropsychological evaluations for the Department of Psychiatry at Emory. And I can tell you from what I've seen, in terms of records – and I have to review records constantly in terms of looking for this possibility and alerting people to that fact – is that I could not see any kind of clear signs from the evidence that I saw.

Dr. Egan further testified that his opinion was based on his own interactions with Moody, a past evaluation of Moody that he was involved in at Emory, and a review of numerous mental health records related to Moody. Dr. Egan pointed out in particular his review of "[t]he psychological testing that [he] saw, in terms of the data that [he] was given" that included Dr. Crown's evaluation and results of his intelligence testing of Moody, which Dr. Crown had testified about and which was admitted into evidence without objection.

Although Moody takes issue with the fact that Dr. Egan was not a neurologist, he has failed to cite a single case in which we have held that it is an abuse of discretion for a trial court to admit the testimony of a psychologist about brain damage based on a review of a defendant's mental health records. Similar to Moody's challenge to Dr. Norman's testimony on the grounds that he exceeded his area of expertise, the fact that Dr. Egan was not a neurologist and had not conducted his own neurological testing of Moody went only to the weight and not to the admissibility of his testimony. See *Adams*

*v. State*, 275 Ga. 867, 868 (3) (572 SE2d 545) (2002) (the fact that a licensed clinical social worker did not hold a medical degree went only to the weight and not to the admissibility of her testimony regarding the defendant). Because the testimony elicited by the prosecutor was not improper, this claim is meritless.

(d) *Alleged Misconduct in Closing Arguments.* Moody contends that the prosecutor made several improper arguments at the close of the sentencing trial that require reversal of his death sentences. Pretermitting the fact that Moody has waived his right to ordinary appellate review of those arguments by failing to object at trial, see *Martin*, 298 Ga. at 279 (7), disapproved on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3, we conclude that they were not improper.

(i) While arguing to the jurors that they should not accept Dr. Hyde's opinion about Moody, the prosecutor remarked, "Of course Dr. Hyde thinks he's the only person that can perform a neurological exam in the United States." Later, the prosecutor argued that Dr. Hyde's conclusions regarding Moody were not consistent with other testimony and evidence that had been presented. The prosecutor

then reminded the jury that Dr. Hyde had testified that, in his experience, state mental health facilities tend to conduct cursory neurological examinations but that Dr. Hyde "had no personal knowledge of any of the Georgia state facilities and ha[d] never . . . toured them" and that Dr. Hyde's testimony here had been contradicted by Dr. Norman's testimony that Georgia's state facilities were "just fine." The prosecutor concluded this portion of his argument by telling the jury that "the State's contention of Dr. Hyde" is that he claimed, "I'm right" and "[e]veryone else is inferior."

Moody contends that the prosecutor committed misconduct by making these remarks regarding Dr. Hyde. But when viewed in context, the prosecutor's brief comments came within "the wide latitude" granted to counsel "in the conduct of closing argument." *Styles v. State*, 309 Ga. 463, 470 (4) (847 SE2d 325) (2020).

(ii) Moody also contends that the prosecutor improperly argued to the jurors: "[Y]ou are the sole judges of credibility. Whether [the witness is] an expert witness or not doesn't matter." This is not an improper argument.

106

The "[c]redibility of witnesses and the weight to be given their testimony is a decision-making power that lies solely with the trier of fact." *Tate v. State*, 264 Ga. 53, 56 (3) (440 SE2d 646) (1994). This is true even with respect to the testimony of expert witnesses. See *McCoy v. State*, 237 Ga. 118, 119 (227 SE2d 18) (1976) ("The jury can consider the expert's credentials and then give such weight and credit to the expert's testimony as it sees fit."). Therefore, the prosecutor's argument here was not improper.

(iii) The prosecutor argued to the jury that letters that Moody had written to Wright while incarcerated and that had been admitted during Wright's testimony "corroborate[d] the relationship that [Wright] ha[d] with Jeremy Moody" and showed that she was "telling [the jury] the truth." The prosecutor then remarked somewhat off-handedly, "interestingly [the evidence about these letters] also show[ed] that apparently [the defense's mitigation specialist] isn't aware of the rules about ferr[y]ing mail out by inmates that [the defense's prison expert] told you about." Moody contends that this remark about the defense's mitigation specialist

107

was improper, because it was "without a factual basis." We disagree.

During its direct examination, the State elicited testimony from Wright regarding a letter written to her from Moody after his incarceration. Wright testified that this letter was sent to her through Moody's defense team, that it was accompanied with Moody's handwritten instructions to "[s]end to Tameka," and that it had been mailed to her in an envelope that had the defense's mitigation specialist's address as a return address. The defense did not object to Wright's testimony or to the State's introduction into evidence of Moody's letter and the envelope in which it was mailed. Indeed, on cross-examination, the defense asked Wright to again confirm that the return address on the envelope containing Moody's letter to Wright was that of the defense's mitigation specialist "sitting right [t]here" and to confirm that the defense team had "helped [her] and [Moody] communicate in jail on occasion," and Wright did so. Later, Moody's own witness, James Aiken, who was qualified to testify as an expert on prisons and the classifications and security assessments of inmates, testified that, other than

letters to the courts or attorneys, a facility's staff approves whether an inmate's letter "goes out." Aiken testified that in the past he had completed a security evaluation of the Fulton County jail and that mail was not supposed to be carried out of that facility outside of that approval process. The prosecutor asked Aiken, "[I]f [Moody] wanted to get a letter to his ex-girlfriend, someone working for the defense team wouldn't be able to ferry that letter out to her, would they?" Aiken responded, "According to the rules and regulations that is correct, sir." Accordingly, the prosecutor's argument was "derived from evidence properly before the jury," and it was not improper. *Spiller v. State*, 282 Ga. 351, 354 (3) (647 SE2d 64) (2007).

(iv) After reminding the jury that defense counsel had "essentially" asked the medical examiner whether it was "possible that the death[s of the victims] w[ere] actually pretty quick," the prosecutor argued that the purpose of that question was to allow defense counsel "to stand up in front of [the jury] and say, oh, it wasn't torture," because "[Moody] killed them quickly[, and t]hey didn't feel any pain." The prosecutor then told the jury that any such

argument would be "offensive," which Moody contends was misconduct.

But the prosecutor's argument was based on a reasonable deduction from the evidence, and we conclude that it came within the wide latitude given to counsel in the conduct of closing argument. See *Walker v. State*, 312 Ga. 232, 240 (4) (c) (862 SE2d 285) (2021); see also *Ballard v. State*, 268 Ga. App. 55, 61 (5) (d) (601 SE2d 434) (2004) (holding that the prosecutor's argument to the jurors that certain testimony that the defendant presented "'should be offensive to [them]' . . . came within the wide latitude given to counsel in closing argument," which includes the ability to argue reasonable inferences from the evidence). Therefore, there was no impropriety, and Moody's claim here is meritless.

(v) Lastly, Moody contends that the prosecutor argued improperly by asserting that Moody had acted in compliance with the book, *The Art of War,* when there was evidence that the book had been found in his cell but no evidence that he had actually read it. This was not an improper argument.

110

In making the statement, the prosecutor reminded the jury of a Fulton County jail deputy's testimony that, "when he saw that [book found in Moody's cell] and the way Moody was acting, he actually read *The Art of War* so he'd be familiar" with it. This deputy testified that the book described how to attack "the weakest links" of a group and that Moody had used that tactic by "target[ing]" new people on the team of specially-trained officers that dealt with high-risk inmates. After reminding the jury of another officer's similar testimony regarding Moody's behavior, the prosecutor argued that Moody would "start with the weakest and move his way up," which was the "[p]attern" taught in the *The Art of War*. As this argument was "derived from evidence properly before the jury," it was not improper on the basis Moody argues. *Spiller*, 282 Ga. at 354 (3).

9. Moody contends that the State violated his state and federal constitutional rights to due process by presenting a theory of the crimes at his sentencing trial that was inconsistent with the theory that it later presented at the trial of his co-defendant, William Felts. In particular, Moody contends that at his sentencing trial the State

111

argued that he alone committed the crimes but that at Felts's trial the State argued that Felts was also responsible. Although this claim is arguably not preserved, [24] we have reviewed the record as a part of our mandatory plenary review under OCGA § 17-10-35 (c) (1) and conclude that it has no merit.[25]

In the past, we have "assumed that there could be a due process problem if the State uses 'inherently factually contradictory theories,'" while at the same time we have noted that there is perhaps some "doubt [as to] whether such a due process right exists." *Battle v. State*, 305 Ga. 268, 274 (2) (b) (824 SE2d 335) (2019) (citations and punctuation omitted); see also 5 Wayne R. LaFave et al., *Criminal Procedure* § 17.4 (a) (4th ed. Nov. 2022 update) ("[O]n the ground 'that the use of inconsistent, irreconcilable theories to secure convictions against more than one defendant in prosecutions

---

[24] Moody raised the claim only after the trial court denied his motion for new trial and never obtained a trial court ruling on it. Ordinarily we would not review such a claim. See *McClendon v. State*, 299 Ga. 611, 616 (4) (A) (791 SE2d 69) 2016) ("Because [the defendant] raises an issue on appeal that was not presented [to] or ruled upon by the trial court, his argument is not preserved for review by this Court.").

[25] At Moody's request, the trial court ordered that the appellate record in Felts's case be included in Moody's appellate record.

for the same crime violate[s] the due process clause,' a defendant may be able to have his conviction overturned because of the *conviction* of another defendant on an inconsistent theory, . . . though the Supreme Court has yet to pass on this theory." (emphasis in original, footnotes, and citation omitted)). In our discussion below, we again assume without deciding that such a due process claim could be cognizable, but we conclude no such claim arises under the facts presented here.

Felts's death penalty trial occurred approximately three years after Moody's plea and sentencing trial. The same prosecuting attorney tried both cases. The State argued at Felts's trial that although Moody was the one who inflicted the fatal injuries to both victims and the one who raped Kimble, Felts was just as guilty as a party to the crimes, because "Felts aided, assisted, encouraged, and made this happen" by participating in the robbery of the victims and then standing by and ensuring that they did not leave the woods. The State urged Felts's jury not to worry about Moody and stated that "Moody [was] for another day, another jury," arguments we

read not as minimizing Moody's actions but instead as focusing on determining Felts's personal guilt in the crimes. See *Battle*, 305 Ga. at 274 (2) (b) (stating that "limiting discussion of Appellant's culpability to a passing remark that she had also been charged and would get her day in court made sense at [her co-defendant's] trial"). In the same way, the State argued at the sentencing phase of Felts's trial, "Let's talk about Felts. That's why we're here. We're not here for Moody."

In comparison, at the beginning of the guilt/innocence phase of Moody's trial, the State indicated in its opening statement that Felts was involved in the crimes with Moody. The prosecutor explained about the period following Moody's arrest:

> [Law enforcement officials] started canvassing the neighborhood to find out about Jeremy Moody and if somebody else had done this with Jeremy Moody because it seemed like it was something that more than one person should have been involved, given that one of the victims may have been able to run or something like that. *And the investigation showed that there was another defendant involved, William Felts,* aka Black Frank. And the witnesses from the neighborhood will tell you that Moody and Black Frank were together that week a lot.

(Emphasis added.)

As discussed above, Moody pled guilty to all counts of his indictment following the State's opening. In presenting a factual basis for Moody's pleas to the trial court during the plea colloquy, the prosecutor began by stating: "[H]ad this case gone to trial the State would have proven beyond a reasonable doubt that on April 5th, 2007, that Jeremy Moody along with, the State's contention, Mr. William Felts confronted the victims in this case, . . . . in the woods behind Bethune Elementary School." The prosecutor then proceeded to describe the factual basis for each of the crimes to which Moody pled guilty. In the sentencing trial that followed Moody's plea, the State no longer had to prove that he had committed the crimes. See *Shepard v. Williams*, 299 Ga. 437, 440 (1) (788 SE2d 428) (2016) (recognizing that a plea of guilty admits the facts set forth in an indictment). And the State also had no need to mention Felts or present any evidence regarding his participation in the crimes. Instead, the State focused on proving the statutory aggravating circumstances and non-statutory aggravating circumstances. See

115

*O'Kelley v. State*, 284 Ga. 758, 766-767 (3) (670 SE2d 388) (2008) (pointing out that the guilt/innocence and sentencing phases of a death penalty trial have different purposes and that different evidence is introduced in each phase).

Moody contends that the State represented to the jury in its closing argument that it had presented "all the facts" surrounding the crimes, despite the fact that the State had presented no evidence about Felts's involvement in the case. But Moody *seriously* misrepresents the prosecutor's argument to that end by lifting his words out of context, including at one point even cobbling together phrases from two different sections of the State's argument that are over 50 pages apart in the transcript.[26]   Our review of the State's

---

[26] In his brief, Moody argues the following:

> More brazenly, the State argued at Mr. Moody's trial that Mr. Moody alone, "by his own choice," Vol. 28, T. 3936, decided to "lay[] in those woods" for someone to rob, Vol. 28, T. 3879. But at Mr. Felts's trial, the State presented evidence that it would be "pretty unreasonable" to suspect that a single person was involved in the crime.

The phrases Moody relies on do not support anything resembling Moody's characterization. The first lifted phrase about deciding to "lay[] in those

closing argument in its entirety shows that, although the State kept the jury properly focused on Moody's role in the crimes for the purposes of determining his appropriate sentences for the murders, nowhere did the State contend that Moody acted alone in committing the crimes.

In sum, based on our review of the two sets of trial transcripts, we conclude that, although the evidence presented and the prosecutor's arguments differed somewhat at each trial, those arguments were consistent with the evidence actually presented at each trial and with the differing procedural posture of each case.

---

woods," was part of the State's argument about Moody's motive to commit a robbery:

> Motive [is] not an element, meaning we don't have to prove that. But you have it here. You know what the motive was. Remember he called Tameka. He said I've got a plan. I'm going to get some money. I'm going to rob someone, laying in those woods waiting for who was going to come along, and unfortunately it was the two kids.

The second phrase appeared in the State's argument about Moody's decision to murder the victims:

> I've got these boards up here that show a picture of them . . . in their lives and then a picture of them . . . from their autopsy. That's what he did. He did that to them. He did that by his own choice.

More importantly, those differences did not go to the core theory of the case, and, therefore, this is not a situation where the State presented separate and irreconcilable theories of guilt. See *Haynes v. Cupp*, 827 F2d 435, 439 (9th Cir. 1987) (holding that "variations in emphasis" were not cause for reversal where "the underlying theory of the case" that each defendant was culpable was consistent). Accordingly, Moody's claim here is meritless.

10. Moody argues that the trial court erred in twice denying his request to charge concerning the consequences of a jury's failure to reach a unanimous sentencing verdict. Even apart from the issue of waiver surrounding Moody's initial request for this charge, we see no error — plain or ordinary — in the trial court's refusal to give it either initially or when it was later requested again during jury deliberations. [27]

---

[27] Although we conclude that the jury instructions in Moody's case were not erroneous in any fashion, we note that, for plain error review with respect to allegedly erroneous jury instructions not properly objected to at trial, this Court applies the four-pronged analysis that we adopted in *Kelly*, 290 Ga. at 33 (2) (a). And, as we explained in Division 7 (b) above, under *both* the plain error review of *Kelly* and the plenary review of Moody's death sentences under

(a) In his requests to charge, Moody proposed the following instruction:

> A death sentence may only be imposed and carried out if all twelve jurors vote for a death sentence. In other words, each juror has the power and authority to give life by voting for a sentence of life imprisonment without parole, or life imprisonment.

At the charge conference, the trial court denied the requested charge, stating that it was "argumentative" and was "covered adequately elsewhere," and Moody did not object to the trial court's denial of his request. The trial court ultimately charged the jury: "Your verdict as to penalty must be unanimous, and it must be in writing, dated, and signed by your foreperson and returned to be read in open court." Moody also did not object to the trial court's giving of this instruction, which tracks the suggested pattern jury instruction. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (2020), § 2.15.80. And, more to the point here, Moody failed to raise an objection regarding the trial court's failure to give

OCGA § 17-10-35 (c) (1), relief would be warranted only if there were a reasonable probability that an unobjected-to error, here allegedly erroneous jury instructions, led to the jury's decision to impose Moody's death sentences.

119

the specific charge he had requested at the charge conference. As a result, his claim is reviewed only for plain error. See OCGA § 17-8-58 (b); *Martin*, 298 Ga. at 278-279 (6) (d).

There is no error, much less plain error, in the instruction given. This Court has repeatedly approved the instruction that was given. See, e.g., *Walker*, 281 Ga. at 165 (11) & n.39. And there was no error in the trial court's refusal to give the specific charge that Moody requested at the charge conference. See *Humphreys*, 287 Ga. at 81-82 (9) (b) ("We have repeatedly held that a trial court is not required to instruct the jury in the sentencing phase of a death penalty trial about the consequences of a deadlock."), disapproved on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3.[28]

(b) In his closing argument, defense counsel argued:

Ladies and gentlemen, there are no hung juries during the sentencing phase in a death penalty case. If the determination is 11 to 1 and one person believes that life without parole is appropriate, that's the verdict, life without parole. . . .

---

[28] See OCGA § 17-10-31 (c) (providing that, if the jury in a death penalty case "is unable to reach a unanimous verdict as to sentence, the judge shall dismiss the jury and shall impose a sentence of either life imprisonment or imprisonment for life without parole").

After deliberating for less than two hours, the jury sent a note asking the trial court to "clarify" the apparent conflict between the trial court's instructions "that the penalty verdict must be unanimous" and defense counsel's argument that "there would be no hung jury" because "if 11 vote[d] for [the] death penalty and one vote[d] for life without parole, the result [would be] life without parole." Moody requested that the trial court provide "some language" that would inform the jurors regarding what would happen if they were unable to reach a unanimous verdict. However, the trial court pointed out to defense counsel that the "[l]aw applicable to a hung jury, which is what you have described, is not applicable to [the jury] at this point in time," and the trial court refused to give such an instruction. Instead, over Moody's objection, the trial court told the jurors that the court had instructed them "as to the law applicable to this case" and directed them to the unanimity instruction in their copy of the court's written instructions that it had given them.

On appeal Moody contends that the trial court erred by redirecting the jury to its previous instruction rather than instructing the jury about what would happen if it were unable to reach a unanimous verdict. But as we noted above, a trial court is not required to instruct the jury in the sentencing phase of a death penalty trial about the consequences of a deadlock.

> [I]n Georgia a unanimous verdict is required even in the sentencing phase of a capital case because under our death penalty law, where a jury is unable to agree on a verdict, that disagreement is not itself a verdict. The jury's deadlock may lead to a sentence of life with or without parole imposed by the trial court, but it does not result either in a mistrial subject to retrial (as in other contexts where a jury deadlocks) or an automatic verdict (as occurs under the death penalty law of other states). Moreover, we have repeatedly held that a trial court is not required to instruct the jury in the sentencing phase of a death penalty trial about the consequences of a deadlock.

*Humphreys*, 287 Ga. at 81-82 (9) (b) (footnote, citations, and punctuation omitted). [29] Accordingly, the unanimity instruction that

---

[29] In *Humphreys*, we explained how modified *Allen* charges should be given during the sentencing phases of death penalty trials when such charges are necessary, see 287 Ga. at 81-82 (9) (b) (citing *Allen v. United States*, 164 U.S. 492, 501 (9) (17 SCt 154, 41 LE2d 528) (1896)). However, the trial court never found it necessary to give a modified *Allen* charge in Moody's case,

the trial court directed the jury to recall was "a correct statement of the law even in the context of the sentencing phase of a death penalty trial." Id.

11. As discussed above, the State's psychologist, Dr. Egan, was qualified without objection as an expert witness in the field of clinical and forensic psychology. Moody contends that his Sixth Amendment right of confrontation under *Crawford v. Washington*, 541 U.S. 36 (124 SCt 1354, 158 LE2d 177) (2004), was violated when Dr. Egan was allowed to testify about the testing and evaluation of Moody conducted by two resident trainees and was then permitted to testify that Moody did not exhibit signs of "brain damage or brain disorder." Even if this claim were preserved, it has no merit.

Dr. Egan testified that in 2012 Dr. Peter Ash, whom the trial court had asked to do an evaluation of Moody's competence to stand trial and criminal responsibility at the time of the crimes, had "some

---

because the jury gave no indication in its note that it was deadlocked and because, shortly before noon on the following day, the jury announced its verdict without submitting any further questions.

questions" that he wanted Dr. Egan to address, specifically, whether Moody was malingering. Dr. Egan testified that to assist him in his evaluation he had assigned two of his resident trainees who were clinical psychologists to conduct some psychological testing of Moody and that he himself met with Moody later. Dr. Egan also testified that the purpose of the testing that the trainees conducted was to detect malingering, that the testing was composed of two parts, and that Moody "became so uncooperative" that his trainees were unable to complete the second part of their testing. Dr. Egan relied on his own interview with Moody and his review of the test results to testify: "On that day that we evaluated him, yes, his behavior during that day suggested to us strongly that he was malingering." Dr. Egan also testified that his opinions regarding Moody's mental condition were based on his education and experience, on his review of numerous records, including records showing Moody's extremely low verbal scores on intelligence tests that were wholly inconsistent with his personal observations of Moody's ability to communicate, and on his own interview of Moody and interactions with him. On

cross-examination, Dr. Egan confirmed that he was not present when the trainees conducted their testing of Moody. The trainees' evaluation and testing results were not admitted into evidence.

We have previously explained:

> In the context of scientific lab reports, the United States Supreme Court has held that the Sixth Amendment right to confrontation grants the accused a right "to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist." *Bullcoming v. Mexico*, 564 U.S. 647, 652 (131 SCt 2705, 180 LE2d 610) (2011). This Court has since held that someone with a significant personal connection to the test could testify in lieu of the scientist who actually conducted it. See *Disharoon v. State*, 291 Ga. 45 (727 SE2d 465) (2012); *Leger v. State*, 291 Ga. 584 (5) (732 SE2d 53) (2012).

*Taylor v. State*, 303 Ga. 225, 230 (4) (811 SE2d 286) (2018). However, we have also clarified that, "[i]n applying [the Sixth Amendment right to confront witnesses], there is a critical distinction between cases where the [test] results were admitted into evidence and those where the [test] results were merely used in an expert's opinion." Id. In the latter type of situations, "[t]he decision of *Bullcoming* . . . is inapplicable. . . ." *Naji v. State*, 300 Ga.

659, 663 (2) (797 SE2d 916) (2017) (citation omitted).

Here, the State never sought to admit the trainees' testing and evaluation into evidence. Instead, Dr. Egan used the facts contained therein, including factual data collected by the trainees, to inform his expert opinion as to whether Moody had malingered on the State's tests and to inform his opinions regarding Moody's mental condition. Accordingly, "[t]he expert opinion admitted at trial was not the restatement of the diagnostic opinion of another expert." *Naji*, 300 Ga. at 663 (2) (citation and punctuation omitted). Therefore, the Confrontation Clause was not violated. See *Taylor*, 303 Ga. at 230 (4) (holding that the Confrontation Clause was not violated where the medical examiner testified as to his independent, expert opinion regarding the facts contained in the report of an autopsy that he did not conduct and where the State did not seek to admit the report itself); *Naji*, 300 Ga. at 662-663 (2) (same, where the medical examiner used another examiner's autopsy report, which was not admitted, to testify about his opinion on the victim's

126

cause of death).[30]

12. Moody argues that, pursuant to the federal and state constitutions, he is ineligible for the death penalty by virtue of his "serious mental illness." Even apart from the fact that Moody failed even to seek a jury verdict on his alleged mental illness, this claim is meritless. See *Brookins v. State*, 315 Ga. 86, 110 (16) (879 SE2d 466) (2022) (reaffirming "that persons with 'mental illness' [do not] constitute a category of persons that, like intellectual disability, must be subject to a categorical exemption from death sentences"

---

[30] Although we hold that *Bullcoming* is inapplicable and thus that Dr. Egan was not required to have a "substantial personal connection" to the resident trainees' testing and evaluation, *Disharoon*, 291 Ga. at 48, we note that this requirement was nevertheless met. In *Disharoon*, we recognized *Bullcoming*'s condemnation of "surrogate testimony" but held that *Bullcoming* does not require the exclusion of a substitute witness who "is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." Id. (citation and punctuation omitted). In that regard, our review of the report detailing the results of the resident trainees' testing and evaluation shows that, while one of the trainees signed the report as "Examiner," Dr. Egan also signed it as "Supervising Licensed Psychologist." Furthermore, it was clear from Dr. Egan's testimony that he requested the specific testing and evaluation completed by the trainees, that he supervised the trainees, that they reported back to him, and that he reached his own independent conclusions regarding whether Moody had malingered. See *Leger*, 291 Ga. at 593 (5) (holding that it was not improper for a scientist to testify who had not personally performed certain DNA tests but had selected the stains for testing, had supervised the worker who did the testing, had interpreted the worker's results, and had written the lab report).

(citing *Lewis v. State,* 279 Ga. 756, 764 (12) (620 SE2d 778) (2005)).

13. Moody contends that the practice of qualifying jurors according to their death penalty views is unconstitutional for various reasons. Pretermitting whether he has abandoned this claim by providing no meaningful argument or citation to authority to support his contentions, see Supreme Court Rule 22, we hold that the claim is meritless. See, e.g., *Walker*, 281 Ga. at 162 (8) ("Qualifying prospective jurors based upon their death penalty views does not deny capital defendants their right to an impartial jury drawn from a representative cross-section of the community and is not otherwise unconstitutional." (citing *Wainwright v. Witt*, 469 U.S. 412, 418-426 (105 SCt 844, 83 LE2d 841) (1985)).

Pretermitting whether Moody has standing to challenge death-qualification on the ground that it violates prospective jurors' constitutional rights to serve as jurors, we reject his claim to that effect here. See *King v. State*, 273 Ga. 258, 267 (20) (539 SE2d 783) (2000) (rejecting a claim that "the constitutional right to freedom of religion and conscience [is violated] where a juror is stricken for

128

cause based upon death penalty views that are derived from religion" without first addressing the question of standing), disapproved on other grounds by *Clark v. State*, 315 Ga. 423, 435 n.16 (883 SE2d 317) (2023). The United States Supreme Court has recognized that only "qualified" jurors are entitled to serve. *Smith v. Texas*, 311 U.S. 128, 130 (61 SCt 164, 85 LE2d 84) (1940). A juror is not qualified if "his or her views on capital punishment . . . would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Morgan v. Illinois*, 504 U.S. 719, 728 (112 SCt 2222, 119 LE2d 492) (1992) (citation and punctuation omitted)); see also *Humphreys*, 287 Ga. at 71-72 (5), disapproved on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3.

14. Moody contends that the trial court erred by denying his motion challenging the constitutionality of Georgia's death penalty statutes on several different grounds. For the reasons set forth below, we discern no error.

(a) Moody contends that Georgia's death penalty scheme fails

sufficiently to narrow the class of persons eligible for the death penalty. However, this Court has repeatedly rejected similar claims, and Moody offers no persuasive reason to do otherwise here. See, e.g., *Arrington v.* State, 286 Ga. 335, 337 (4) (687 SE2d 438) (2009) (citing *Zant v. Stephens*, 462 U.S. 862, 876-879 (103 SCt 2733, 77 LE2d 235) (1983), for the proposition that "Georgia's statutory aggravating circumstances constitutionally narrow the class of death-eligible defendants").

(b) Moody makes an equal protection claim that Georgia's death penalty statutes provide no uniform standard or procedure guiding the decision to seek the death penalty made by the district attorneys in the State's numerous judicial circuits. But we have previously explained that district attorneys do not have unfettered discretion under the death penalty statutes, because "[a] district attorney's decision to seek the death penalty requires the exercise of professional judgment as to whether an aggravating circumstance exists and, thus, as to whether the imposition of the death penalty should be submitted for a jury's determination." *Crowe v. State*, 265

Ga. 582, 595 (24) (458 SE2d 799) (1995). "The [district attorney]'s discretion is also 'limited by the jury's ultimate decision' and the 'strength of the evidence' in any given case." *Wagner v. State*, 282 Ga. 149, 152 (5) (646 SE2d 676) (2007) (citation omitted). Moreover, Moody's claim fails because "he has not shown any invidious discrimination in his case." *Ellington*, 292 Ga. at 116 (3) (b), disapproved on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3.

(c) Lastly, Moody asserts that Georgia's death penalty statutes give unguided discretion to the jury over how to consider mitigating circumstances, resulting in the arbitrary imposition of the death penalty. But Moody has not alleged that the trial court failed to charge his jury properly at his sentencing trial on mitigating circumstances, and "the Georgia death penalty scheme sufficiently narrows the application of the death penalty and guides the jury's consideration of it as a possible sentence, while also affording jurors the latitude to consider all mitigating circumstances in their deliberations." *Ellington*, 292 Ga. at 116 (3) (a), disapproved on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3.

131

*Sentence Review*

15. Upon our review of the entire record, including those portions relevant to the improper victim impact testimony that we discuss above and relevant to the improper cross-examination of an expert witness and the improper examination of a lay witness that our analysis above assumes to have occurred,[31] we conclude that the sentence of death in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor.  See OCGA § 17-10-35 (c) (1); see also *Martin*, 298 Ga. at 279 (6) (d) (stating regarding this Court's review under OCGA § 17-10-35 (c) (1): "That plenary review guards against any obvious impropriety at trial, whether objected to or not, that in reasonable probability led to the jury's decision to impose a death sentence.").

---

[31] Referring *only* to the allegedly improper victim impact statements discussed in Division 7, Moody argues that his death sentences should be reversed based on a cumulative error analysis. See *Lane*, 308 Ga. at 14 (1).  In this case, because Moody did not object to the improper victim impact statements at trial and thus those claims are only subject to review for plain error, our *plenary* review here for passion, prejudice, or any other arbitrary factor applies the same standard as would be applied under *Lane*, and it subsumes any such cumulative analysis of the improper victim impact statements that might otherwise be warranted under *Lane*.

132

16. In its sentencing verdict, the jury found beyond a reasonable doubt that Kimble's murder was committed while Moody was engaged in the capital felonies of the murder of Mattox and the rape of Kimble, that it was committed for the purpose of receiving money or any other thing of monetary value, and that it was outrageously or wantonly vile, horrible, or inhuman in that it involved torture and an aggravated battery to the victim and the depravity of mind of the defendant. See OCGA § 17-10-30 (b) (2), (4), (7). The jury found beyond a reasonable doubt that Mattox's murder was committed while Moody was engaged in the capital felonies of the rape and murder of Kimble, that it was committed for the purpose of receiving money or any other thing of monetary value, and that it was outrageously or wantonly vile, horrible, or inhuman in that it involved torture and an aggravated battery to the victim and the depravity of mind of the defendant. See OCGA § 17-10-30 (b) (2), (4), (7). As we concluded in our review in Division 1, the evidence was sufficient to support the jury's finding beyond a reasonable doubt the existence of each of these statutory

133

aggravating circumstances. And, "[e]ven applying what this Court has previously described as a 'rule' against 'mutually supporting aggravating circumstances,' both death sentences in this case remain supported by [at least] one statutory aggravating circumstance." *Brookins*, 315 Ga. at 115 (23).

17. In the direct appeal of a death sentence, this Court is required to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." OCGA § 17-10-35 (c) (3). In making this determination, we note that Moody's crimes were brutal, unprovoked attacks on minor victims that went well beyond the robbery that served as his initial motive. Moody forced his victims to strip naked, bound the 15-year-old male victim, raped and strangled the 13-year-old female victim, viciously stabbed both of the victims repeatedly with a sharp instrument like a screwdriver, and then left them in the woods to bleed to death. Upon our review of all of the evidence presented in the sentencing trial, we conclude that the death sentences imposed for the murders in this case are

not disproportionate punishment within the meaning of Georgia law. See id.; *Gissendaner v, State*, 272 Ga. 704, 717 (19) (a) (632 SE2d 677) (2000) (holding that this Court's statutorily mandated proportionality review concerns whether "a given sentence is excessive per se or substantially out of line"). The cases in the Appendix support this conclusion, as each shows a jury's willingness to impose a death sentence for the commission of a murder involving the section (b) (7) statutory aggravating circumstance or a murder involving a minor person, a rape, or the deliberate, unprovoked killing of two or more persons. See *Barrett v. State*, 292 Ga. 160, 190 (4) (733 SE2d 304) (2012) (stating that this Court is "not required to find identical cases for comparison in [its] proportionality review.").

*Judgment affirmed. All the Justices concur.*

# APPENDIX

*Brookins v. State*, 315 Ga. 86 (879 SE2d 466) (2022); *Young v. State,* 312 Ga. 71 (860 SE2d 746) (2021); *Willis v. State*, 304 Ga. 686 (820 SE2d 640) (2018); *Martin v. State*, 298 Ga. 259 (779 SE2d 342) (2015); *Hulett v. State*, 296 Ga. 49 (766 SE2d 1) (2014); *Edenfield v. State*, 293 Ga. 370 (744 SE2d 738) (2013), disapproved on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3; *Rice v. State*, 292 Ga. 191 (733 SE2d 755) (2012), overruled on other grounds by *State v. Lane*, 308 Ga. 10, 23 (Appendix) (838 SE2d 808) (2020), and disapproved on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3; *Barrett v. State*, 292 Ga. 160 (733 SE2d 304) (2012); *Ledford v. State*, 289 Ga. 70 (709 SE2d 239) (2011), disapproved on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3; *Loyd v. State*, 288 Ga. 481 (705 SE2d 616) (2011); *Tate v. State*, 287 Ga. 364 (695 SE2d 591) (2010); *Humphreys v. State*, 287 Ga. 63 (694 SE2d 316) (2010), disapproved on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3; *Stinski v. State*, 286 Ga. 839 (691 SE2d 854) (2010); *Arrington v. State*, 286 Ga. 335 (687 SE2d 438) (2009); *O'Kelley v. State*, 284 Ga. 758 (670 SE2d 388) (2008); *Rivera v. State*, 282 Ga. 355 (647 SE2d 70) (2007); *Lewis v. State*, 279 Ga. 756 (620 SE2d 778) (2005); *Braley v. State*, 276 Ga. 47 (572 SE2d 583) (2002); *Terrell v. State*, 276 Ga. 34 (572 SE2d 595) (2002); *Lucas v. State*, 274 Ga. 640 (555 SE2d 440) (2001); *Rhode v. State*, 274 Ga. 377 (552 SE2d 855) (2001); *Presnell v. State*, 274 Ga. 246 (551 SE2d 723) (2001); *Pruitt v. State*, 270 Ga. 745 (514 SE2d 639) (1999).